People v Williams (2022 NY Slip Op 04135)

People v Williams

2022 NY Slip Op 04135

Decided on June 28, 2022

Appellate Division, First Department

WEBBER, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: June 28, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Barbara R. Kapnick
Troy K. Webber Manuel Mendez Bahaati E. Pitt John R. Higgitt

Ind. No. 2148/18 Appeal No. 15966 Case No. 2020-00275 

[*1]The People of the State of New York, Respondent,
v
Daniel Williams, Defendant-Appellant

Defendant appeals from a judgment of the Supreme Court, New York County (Ann E. Scherzer, J.), rendered November 12, 2019, as amended January 24, 2020, convicting him, after a jury trial, of attempted robbery in the second degree, and sentencing him, as a second violent felony offender, to a term of five years.

Robert S. Dean, Center for Appellate Litigation, New York (Jan Hoth of counsel), for appellant.
Alvin L. Bragg, Jr., District Attorney, New York (Karen Schlossberg and Alice Wiseman of counsel), for respondent.

WEBBER, J. 

Defendant was charged by indictment with attempted robbery in the second
degree. Specifically, it was alleged that in May 2018, between 167th and 168th Streets on Amsterdam Avenue in New York County, defendant approached the complainant who had just completed his shift as a livery driver, pulled a gun out of his pocket, pointed the gun at the complainant and repeatedly said, "Give me the money." The complainant later identified defendant, who was wearing a hoodie, standing on the sidewalk near West 168th Street and Amsterdam Avenue as the individual who attempted to rob him. No gun was recovered from defendant's person or a search of the area. Surveillance videos showed an interaction between the complainant and defendant.
Prior to the termination of the hearing to suppress physical evidence, defendant stated that he wished to represent himself for the remainder of the hearing. The hearing court discussed with defendant his reasons for the request. The court also advised defendant that "it was not a good idea" to represent himself and that one factor to be considered in deciding whether defendant could represent himself was his "ability to conduct himself properly." Based upon defendant's insistence, the court then relieved counsel and adjourned the case for new counsel to be assigned. New counsel was assigned the same day and after speaking with defendant reiterated that defendant wanted to represent himself. Defendant stated that he was prepared to go forward with argument. The case was adjourned for the new counsel to speak further with defendant and to familiarize himself with the case.
On the adjourn date, following argument by the prosecutor and defendant, the court denied defendant's motion to suppress evidence.
In advance of the commencement of trial, defendant informed the trial court that he wished to represent himself at trial. The trial court engaged in an extensive colloquy with defendant, inquiring into his education and knowledge of the legal system. The trial court advised defendant that if he were to represent himself, he would have to conduct himself the same as an attorney, and that he was to be respectful to everyone in the courtroom. Defendant assured the court he would do so. The court stated that it would provide counsel to act as defendant's legal advisor, in order to answer any questions he may have.
Defendant conducted the cross-examination of the People's witnesses. After [*2]the People presented their evidence, defendant testified on his own behalf. He did so in narrative form. In sum and substance, defendant testified that he was selling drugs in midtown Manhattan when a man with a tattooed face asked him for money. After defendant gave him money, the man started following defendant. Defendant walked away and saw three other men walking on Eighth Avenue, staring at defendant. He was worried that the men were pursuing him because he entered other drug sellers' territory. Defendant then took a taxi to 116th Street, near his brother's home. While exiting the taxi, defendant saw other cars pulling over, so he got back into the taxi and rode to 125th Street. Then he took a bus to Amsterdam Avenue, near 167th Street. After he exited the bus, he saw the men from earlier, still following him. When he walked away from them, he saw a van following him on 167th Street, which was deserted other than the men following him. Defendant saw the complainant walking toward him and carrying a bag, which the complainant claimed contained food for his family. Defendant feared for his life and acted as if he were armed but did not ask for money. The complainant fled.
Midway through defendant's testimony, for reasons discussed herein, the court curtailed his testimony and subsequently terminated defendant's self-representation. Defendant's legal advisor was directed to proceed with the remainder of the trial. The court gave an instruction to the jury that they were not to draw any negative inference from counsel now taking over. Following three days of deliberation, the jury returned a verdict of guilty on the charge of attempted robbery in the second degree.
Discussion
The trial court providently terminated defendant's self-representation and directed counsel to proceed with the trial. It is well settled that a criminal defendant has a constitutional right to represent him/herself (Faretta v California, 422 US 806, 819-821 [1975]; People v Arroyo, 98 NY2d 101, 103-104 [2002]; People v Smith, 92 NY2d 516, 520 [1998]). However, that right is not absolute. A trial court may deny or revoke defendant's self-representation where the defendant engages in "disruptive or obstreperous conduct" (People v McIntyre, 36 NY2d 10, 17-19 [1974], revg 41 AD2d 776 [2d Dept 1973]). Contrary to defendant's arguments, McIntyre does not require a finding that defendant intended to disrupt or manipulate the proceedings. There, the court found denial of the defendant's motion to defend pro se was improper. It stated that the trial court's inquiry of the defendant was conducted in what it described as "an abusive manner calculated to belittle a legitimate application" (id.at 19). It was for these reasons that the Court concluded that the defendant's disruptive behavior did not justify forfeiture of the right of self-representation.
Similarly, this Court has also held that disruptive conduct disqualifies a defendant from self-representation (see People v Irick[*3], 203 AD3d 517 [1st Dept 2022] [trial court providently denied the defendant's request to proceed pro se, noting the defendant's escalating disruptive behavior during the early trial proceedings as well as the defendant's use of profanity and threats to the court and counsel]; People v Williams, 134 AD3d 639 [1st Dept 2015], lv denied 27 NY3d 970 [2016] [the court providently exercised its discretion in ejecting the pro se defendant from the courtroom and thus precluding him from continuing to represent himself, due to the defendant's persistently obstreperous and disruptive conduct]; People v Cooks, 28 AD3d 362 [1st Dept 2006], lv denied 7 NY3d 787 [2006]) [the trial court acted properly in revoking permission for the defendant to represent himself when the defendant was disruptive, feigned mental illness, feigned physical ailments and repeatedly asked to leave the courtroom and claimed illness when summoned back to the courtroom].
Here, the record supports a determination that defendant's conduct prevented the fair and orderly exposition of the issues and was disruptive to the proceedings (see McIntyre at 17). During the examination of the People's witnesses, defendant was repeatedly told by the court to "calm down," to not get agitated, to not argue and be combative with the witnesses, and to not argue with the court regarding its rulings. The record also reflects instances where the court explained its rulings to defendant, defendant stated he understood and would then immediately engage in the same conduct. Moreover, during his testimony, the court repeatedly admonished defendant to stop making arguments to the jury. When asked twice by the court to sit down, he refused to do so. Defendant also repeatedly ignored the direction of the court officer to sit down. Instead, defendant remained standing, continued his argument and questioned the court's ruling. Defendant also made reference to his over one-year period of pretrial detention as well as that he had a teenage son.
It is clear from the record that the court's termination of defendant's self-representation was not, as asserted by defendant, based upon an isolated incident during defendant's testimony. Rather, it was the culmination of defendant's escalating, agitated behavior. Further, defendant was previously instructed by the trial court that were he allowed to represent himself he was to conduct himself as an attorney would and was to be respectful of everyone in the courtroom yet failed to do so.
Contrary to defendant's argument, his absence from a colloquy conducted by the court did not violate his right to be present at a material stage in the proceedings. As stated above, midway through his narrative testimony, the court curtailed defendant's testimony. The record indicates that during defendant's testimony, the court repeatedly told defendant to calm down, to slow down, and to stop arguing and putting forth arguments to the jury. Ultimately the court announced that the proceedings [*4]would end for the day (Friday) and resume on Monday morning. After the jury exited, the court explained that it had taken these actions because defendant was extremely agitated and as a result, he was not "telling a coherent story." The court then asked that defendant be "taken in the back for a few minutes to calm down." It was during defendant's absence that the following colloquy took place:
(Record suspended)
"THE COURT: I will order a psychiatric evaluation.
I don't think this is a fair proceeding with the defendant being in the state of mind that he appears to be in right now.
So I will order a psychiatric evaluation. I hope that is done over the weekend, and I will do whatever it takes to make sure we get the results of it.
Mr. Nathanson, do you know if he was on medication during the proceeding until today? You don't think he's been on medication today, other than today, on psychiatric medication?
"MR. NATHANSON (Defense Counsel): I do not. I have - - I do not. This Harlem Hospital report is from about two weeks before we discussed. It says no medication. That was a year — plus ago, so I don't know, Judge.
"MS. SMITH (Assistant District Attorney): Judge, while I understand that Mr. Williams was obviously very upset this afternoon toward the end here, he understands what is going on. He understands the roles of everyone. He is making — — his arguments are good arguments. He has a defense.
I don't know that a psychiatric exam is necessary. I think having him get the weekend to cool off is good.
Up to point he has a very clear defense of what he is trying to say. He's been making his arguments. He knows the roles of everybody here.
I understand that he gets easily worked up, but I'm not sure at this point in the trial a psychiatric exam is necessary. I think we should continue with the trial as moving forward from here.
"THE COURT: I know that's your position. I assumed that would be the DA's position. However, I am looking at the global picture and looking at a defense which is paranoid by its very nature.
My job is only to make sure that the case goes forward as quickly and as expeditiously as possible, but also to make sure we are not doing injustice to a person suffering from a very serious mental illness.
So I don't exactly know how I'm supposed to proceed in a situation like this.
And I certainly can't subject the jury to this type of spectacle in my opinion where the defendant is just shooting himself in the foot over and over again.
So maybe  ultimately I will do research on it and decide if that's what I have to do. But based on his behavior in the courtroom and the things he saying and seems to believe, I think it's incumbent upon me to take a pause and figure out the best way to proceed.
"MS. SMITH: Judge, the only other thing I want to put on the record — —
"THE COURT: I will  no, I will bring the defendant out and speak to him.
What is it that you want to put on the record?
"MS. SMITH: He testified in the Grand [*5]Jury three weeks after he was arrested and there was nothing in his statement that indicated on the night this happened that he was paranoid. He was anything other than perfectly fine.
The statement that he gave to the Grand Jury was much different, but much clearer. And there was so if we are talking about the mental state at the time versus today —
"THE COURT: Could I see the Grand Jury minutes, please.
"MS. SMITH: Yes.
"THE COURT: Off the record.
(Discussion of the record)
Defendant was then brought back to the court whereupon the following colloquy occurred:
"THE COURT: All right, Mr. Williams, have you calmed down a little bit?
"DEFENDANT PRO SE: Yes."
The court again admonished defendant regarding his behavior and stated that his testimony would resume on Monday morning. There was no further discussion of a psychiatric examination, and no psychiatric examination of defendant was ordered.
Defendant argues that his absence during the above colloquy was violative of his right to counsel and his right to be present at a material stage in the proceedings and therefore requires reversal. Preliminarily, contrary to defendant's characterizations, this was not a hearing to determine whether defendant was no longer competent to stand trial. The court never stated that it was considering ordering an examination pursuant to CPL 730. It specifically stated that it was considering a psychiatric examination based upon defendant's agitated state. There was no statement or suggestion by the court that defendant did not understand the proceedings, only that defendant continually ignored the court's rulings and attempted to offer arguments to the jury during the trial testimony.
There is no doubt that a defendant has a right to be present for any material stage of a trial (CPL 260.20; People v Roman, 88 NY2d 18, 25-26 [1996]). A "pro se defendant must be allowed . . . to argue points of law, . . . and to address the court . . . at appropriate points in the trial" (People v Rosen, 81 NY2d 237, 244 [1993] [citation and internal quotation marks omitted]). The defendant may not be excluded from those proceedings where his or her absence would be appropriate because he or she is acting as counsel (id. at 244). However, not every interaction is "a material stage" requiring the defendant's presence or a "critical stage" at which there is a right to have counsel present (see People v Garcia, 92 NY2d 726 [1999]; People v Rodriguez, 85 NY2d 586, 590-591 [1995]; People v Joseph, 168 AD3d 877 [2d Dept 2019], lv denied 33 NY3d 977 [2019]; People v Torres, 61 AD3d 489 [1st Dept 2009], lv denied 12 NY3d 921 [2009]).
"The right to be present under CPL 260.20 extends to every ancillary proceeding that is a material stage of the trial, that is, proceedings in which a defendant's presence could have a substantial effect on his or her ability to defend against the charges" (People v Roman, 88 NY2d at 25-26 [internal quotation marks omitted]). The Court [*6]in Roman stated that "[a] defendant's presence is substantially and materially related to the ability to defend when the defendant 'can potentially contribute to the proceedings' under scrutiny (citing People v Sprowal, 84 NY2d 113, 118 [1994]); or when a defendant's 'presence would have been useful in ensuring a more reliable determination' of the particular proceeding at issue" (citing People v Morales, 80 NY2d 450, 454 [1992]). The Court went on to state that "[i]nvocation of the statutory right to be present will be rejected, however, when the claim that a defendant's presence would have had an impact on the outcome of the trial is 'speculative'" (People v Roman, 88 NY2d at 26).
It is clear from the record that defendant's presence would have been "useless, or the benefit but a shadow" (People v Morales, 80 NY2d at 454, quoting Snyder v Massachusetts, 291 US 97, 106—107 [1934]). Defendant has made no showing as to how he could have "potentially contribute[d] to the proceeding," or how his "presence would have been useful in ensuring a more reliable determination" (People v Roman, 88 NY2d at 26). As stated, the court made no ruling and took no action regarding its ruminations as to whether a psychiatric examination of defendant should be ordered. While such an examination could have impacted the trial, no examination was ordered. Given this, it is unclear as to how defendant's presence could have afforded him any meaningful opportunity to affect the outcome (see id.).
Defendant argues that a colloquy with him was necessary to "answer the question of his fitness." However, the court never suggested defendant was unfit to proceed with the trial. Defendant also asserts that he may have argued that a "730 examination would not have delayed trial." Again, there was never a mention of a 730 examination. This argument is incongruous with defendant's predominate argument that his self-representation was improperly terminated.
Finally, the suggestion by defendant that the ultimate termination of his self-representation was the result of the above colloquy is baseless speculation and belied by the record of defendant's behavior throughout the proceedings.
The Court properly declined to excuse Juror No. 2, finding that he was not grossly unqualified. CPL 270.35[1] states in pertinent part:
"If at any time after the trial jury has been sworn and before the rendition of its verdict, a juror is unable to continue serving by reason of illness or other incapacity, or for any other reason is unavailable for continued service, or the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature, but not warranting the declaration of a mistrial, the court must discharge such juror. . ."
During deliberations, the court was informed that Juror No. 2 stated that he did not wish to return to the trial and to resume deliberation. The juror [*7]was directed to appear and the court, in the presence of counsel and defendant, engaged in a colloquy with the juror. It was noted that during the direct examination of the complainant, the complainant identified Juror No. 2 as the individual who had attempted to rob him. However, on cross-examination by defendant, the complainant retracted his statement and identified defendant as the individual who attempted to rob him.
Once presented with information indicating that a sworn juror may be grossly unqualified, a trial court must conduct a " 'probing and tactful inquiry' of the juror" (People v Kuzdzal, 31 NY3d 478, 486 [2018], quoting People v Buford, 69 NY2d 290, 299 [1987]). "[T]he standard for discharging a sworn juror . . . is satisfied only when it becomes obvious that a particular juror possesses a state of mind which would prevent the rendering of an impartial verdict"; this standard "is higher than that required for the removal of a prospective juror" (Kuzdzal, 31 NY3d at 483 [emphasis in original; internal quotation marks and citation omitted]). Here, the record indicates that the court conducted a probing and tactful inquiry of Juror No. 2 and properly found that the juror was not grossly disqualified. While the juror initially said he could not be "fair," further inquiry elicited that the complainant's testimony that the juror looked like the individual who attempted to rob him did not "give [the juror] an opinion" but merely "helped base [his] opinion". The juror gave no indication that he could not consider the case with an open mind. Defendant's argument that the court improperly precluded defense counsel from asking Juror No. 2 what happened in the jury room is without merit. The juror's vague reference to what had been said in the jury room did not warrant undermining "[t]he strong public policy favoring the absolute confidentiality of jury deliberations," which "is not lightly to be disregarded" (People v Bouton, 50 NY2d 130, 138 [1980]). We note also that counsel ultimately declined to consent to the removal of the juror.
Under these circumstances, the juror's "declaration regarding emotions alone d[id] not render [him] grossly unqualified" (People v Batticks, 35 NY3d 561, 566 [2020] [internal quotation marks and citation omitted]) and the court properly declined to excuse the deliberating juror.
We have considered defendant's remaining contentions and find them unavailing.
Accordingly, the judgment of the Supreme Court, New York County (Ann E. Scherzer, J.), rendered November 12, 2019, as amended January 24, 2020, convicting defendant, after a jury trial, of attempted robbery in the second degree, and sentencing him, as a second violent felony offender, to a term of five years, should be affirmed.
Judgment, Supreme Court, New York County (Ann E. Scherzer, J.), rendered November 12, 2019, as amended January 24, 2020, affirmed.
Opinion by Webber, J. All concur.
Kapnick, J.P., Webber, Mendez, Pitt, Higgitt, JJ.[*8]
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: June 28, 2022