People v Kuzdzal (2018 NY Slip Op 03304)

People v Kuzdzal

2018 NY Slip Op 03304 [31 NY3d 478]

May 8, 2018

DiFiore, Ch. J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, August 29, 2018

[*1]

The People of the State of New York, Appellant,
v
Matthew Kuzdzal, Respondent.

Argued March 28, 2018; decided May 8, 2018

People v Kuzdzal, 144 AD3d 1618, reversed.

{**31 NY3d at 480} OPINION OF THE COURT

Chief Judge DiFiore.
 On this appeal, we are asked to determine whether the trial court abused its discretion when it chose not to conduct an inquiry of two sworn jurors pursuant to People v Buford (69 NY2d 290 [1987]). Alerted to a complaint by a courtroom spectator that during a break in the trial the spectator allegedly overheard the jurors refer to defendant by a derogatory term, the trial court immediately called the spectator to the stand and elicited sworn testimony regarding her allegation. At the conclusion of the examination, the judge determined that a Buford inquiry was not required based on the testimony provided. We conclude on this record that the trial court made an implied credibility finding that the spectator was not worthy of belief and therefore a Buford inquiry was not warranted. This determination by the trial court was not reviewed by the{**31 NY3d at 481} Appellate Division. It was error for the Appellate Division to opine as to what remedy was warranted in response to the content of the spectator's allegation, without determining whether the allegation was credible in the first instance. Accordingly, we reverse the Appellate Division order and remit the case to that Court to exercise its own fact-finding power to consider and determine whether the trial court's finding as to the spectator's credibility was supported by the weight of the evidence.
[*2]I.
Defendant was convicted, upon a jury verdict, of murder in the second degree and predatory sexual assault against a child. The issues before us arise from an allegation made by a courtroom spectator at the close of the evidence at defendant's trial. The record is clear that, on the day in question, the jury entered the courtroom at 9:44 a.m. and the trial continued uninterrupted until the defense rested and the jury was dismissed for the day at approximately 12:04 p.m. The next morning, the trial continued through summations and the court recessed at 10:35 a.m. Shortly thereafter, defense counsel reported to the court that a spectator claimed that, while outside the courthouse the day before, she overheard two female jurors in conversation using a derogatory term to refer to defendant. The trial court immediately directed the spectator to take the witness stand and proceeded to take her sworn testimony.
The spectator specifically testified that on the day before, during a 15-minute recess taken by the court, she and her friend were outside the courthouse where she observed two female jurors smoking a cigarette "talking about [defendant's] a scumbag." She and her friend briefly stopped and listened to the conversation and, later, because she did not think it was "right," notified defense counsel. The spectator further stated that these jurors were in the back row laughing and making faces during the trial.
However, the spectator's testimony was inconsistent as to when the alleged misconduct occurred. The spectator initially stated that the jurors' remarks occurred "after court." Upon further questioning by counsel, the spectator posited that the incident occurred during a 15-minute break in the morning. When told there was no 15-minute break in the morning, she changed her testimony, claiming the conversation took place{**31 NY3d at 482} around noon. The record was unequivocal that the court did not take any break that morning and that the jury was sent home for the day at 12:04 p.m. The spectator also explained that she was ejected from the courthouse on the day in question for "sa[ying] something in the hallway." The prosecutor pressed her as to whether she was the person who started trouble in the hallway and was directed to leave the courthouse. The spectator denied starting trouble, but acknowledged that a court officer told her to leave the courtroom and that she was not allowed back in until the next day. Although defense counsel had apparently identified the spectator as defendant's girlfriend, the witness denied being defendant's paramour, but confirmed that she was his lifelong friend.
At the end of the examination, defense counsel asked the court to perform an inquiry of the jurors. The prosecutor argued that the elicited testimony did not meet the standard necessary to trigger the inquiry and asked the court to "make a ruling as to whether [you] find this description credible first." In immediate response, the judge denied defendant's request, stating: "I don't believe that an inquiry of the juror is necessary or appropriate here . . . [b]ased on what I heard."
The Appellate Division opined that the trial court made no findings, express or implied, including as to the spectator's credibility. Describing the trial court's ruling as conclusory, it held the court failed to make "an implied determination that the observer's testimony was incredible" (144 AD3d 1618, 1621 [4th Dept 2016]). The Court nonetheless concluded that "the jurors' alleged reference to defendant as a 'scumbag' indicated the possibility of juror bias, and thus . . . the court should have granted defendant's request to make an inquiry of the jurors" (id.). In contrast, the dissent specifically concluded that the trial court "determined that the spectator's testimony was not sufficiently credible" to trigger a Buford inquiry "by stating that it was basing its ruling on what it had heard" (id. at 1624 [Smith, J.P., and Peradotto, J., dissenting]). The dissent continued, "[h]ere, especially in light of the significant evidence in the record supporting the court's determination not to credit the testimony of the spectator, we see no reason to disturb that determination" (id.). Accordingly, the dissent reasoned that because there was "no credible evidence indicating that any juror engaged in misconduct, there was no need for a further inquiry of the individual jurors" (id.). One of the dissenting Justices granted the People leave to appeal (28 NY3d 1190 [2017]).{**31 NY3d at 483}
II.
A defendant's constitutional right to an impartial jury verdict is fundamental (see NY Const, art I, §§ 6, 2; US Const 6th, 14th Amends) and the procedure mandated in our Buford decision to protect that [*3]right is critical to our criminal justice system. Two statutory provisions afford the necessary constitutional protection to defendants: CPL 270.35, which governs the procedure for discharge of a sworn juror; and CPL 270.20, which dictates the procedure to be employed when a prospective juror is challenged for cause. As the spectator's allegation concerned two sworn jurors, CPL 270.35 is implicated. That provision mandates that
"[i]f at any time after the trial jury has been sworn and before the rendition of its verdict, . . . the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature . . . the court must discharge such juror" (CPL 270.35 [1]).
We have explained that the standard for discharging a sworn juror pursuant to CPL 270.35 "is satisfied only 'when it becomes obvious that a particular juror possesses a state of mind which would prevent the rendering of an impartial verdict' " (Buford, 69 NY2d at 298 [citation omitted and emphasis added]). Indeed, as we have underscored in the past, "[t]he 'grossly unqualified' standard for the removal of a sworn juror upon a record of an obviously partial state of mind is higher than that required for the removal of a prospective juror" during voir dire, which is premised on a finding that the prospective juror "has a state of mind that is likely to preclude him from rending an impartial verdict" (People v Spencer, 29 NY3d 302, 309-310 [2017], citing Buford, 69 NY2d at 298; CPL 270.20 [1] [b]). Of course, the more exacting standard for discharge of a sworn juror makes perfect sense—as a defendant has a constitutional right to be tried by a jury "in whose selection [the defendant] has had a voice" (Buford, 69 NY2d at 297-298 [internal quotation marks and citation omitted]). Particularly relevant here, we expressly held that "[a] 'Trial Judge generally is accorded latitude in making the findings necessary to determine whether a juror is grossly unqualified under CPL 270.35, because that Judge is in the best position to assess partiality in an allegedly biased juror' " (Spencer, 29 NY3d at 310, quoting People v Rodriguez, 71 NY2d 214, 219 [1988]).{**31 NY3d at 484} There is no one-size-fits-all approach to address allegations of juror misconduct and "each case must be evaluated on its unique facts to determine whether a particular juror must be disqualified under CPL 270.35" (Buford, 69 NY2d at 299).
 Here, unlike many of our prior cases, the allegation of juror misconduct did not come from the wording of a jury note, the personal observations of court personnel, or a statement from an individual juror. Instead, the allegation came from a courtroom spectator—and defendant's lifelong friend. The trial court, when presented with the third-party allegation of juror misconduct, rather than immediately questioning the jurors, and possibly unnecessarily intruding on the sanctity of the jury, instead chose to first question the source of the allegation to ascertain its reliability. The trial court—which demonstrated its careful attention to the proceedings as evidenced by its earlier removal of a juror who had fallen asleep during trial and its utilization of a Buford inquiry with respect to the alleged conduct of a different juror—called the spectator to the stand and asked her a series of questions under oath. The court's determination to examine the source of the allegation before proceeding to a Buford inquiry of the sworn jurors based on the mere reporting of the allegation itself is within the discretion of the trial court and is, indeed, a procedure that has been found to be reasonable (see People v Matiash, 197 AD2d 794 [3d Dept 1993], lv denied 82 NY2d 899 [1993]).
In People v Matiash, the Appellate Division reviewed the action of the County Court in conducting an inquiry of a witness as opposed to a juror. The Third Department stated:
"County Court chose to begin its in camera interrogation not with the jurors themselves, but rather with the witness in an effort to first ascertain exactly what that witness had seen and heard. This being the least disruptive method of initially ascertaining the particulars, we see no error in this mode of proceeding" (197 AD2d at 796).
[*4]
Thus, as here, the trial court in Matiash used its fact-finding power along with its unique ability to assess the demeanor of the witness alleging juror misconduct to conclude that the allegations did not trigger a Buford inquiry. In Matiash, the trial court's conclusion was based on the "innocuous" nature of the allegation (id.). In this case, the trial court's conclusion was based on the lack of credibility of the interested spectator. While the trial court's reasoning here was not as explicit as{**31 NY3d at 485} that of the court's in Matiash, the record below supports the conclusion that the trial court made an implied determination that the spectator was unworthy of belief in direct and immediate response to the prosecutor's request that the court rule as to whether it found the spectator's "description credible" before proceeding to the Buford inquiry.
We have previously allowed that a trial judge, in the exercise of his or her discretion, may fashion an appropriate procedure to initially determine whether a Buford inquiry is required under the facts of the particular case. For example, in People v Mejias (21 NY3d 73, 77 [2013]), a note from a juror stated, "We want to know how/when and under what pretext [a codefendant] met [defendant]" (emphasis omitted). Defense counsel argued that "the use of the word 'we' in the note implied that at least two of the jurors had been engaged in premature deliberations" and requested that the court conduct a Buford inquiry of the juror who wrote the note (id.). We held it was not an abuse of discretion to forgo the Buford inquiry and instead address the entire panel in order to avoid isolating any particular jurors (see id. at 77-78).
In this regard, a trial court's "investigation of juror misconduct or bias is a delicate and complex task" (United States v Peterson, 385 F3d 127, 134 [2d Cir 2004] [internal quotation marks and citation omitted]), and courts must have broad flexibility in matters involving the jury. We review a court's decision regarding a juror's alleged impartiality for abuse of discretion because the trial judge, having the ability to continually observe the jury in court, is in the best position to devise an appropriate remedy (Mejias, 21 NY3d at 80; see also Peterson, 385 F3d at 134). As the Supreme Court has explained, a defendant's right to due process does not require a trial court to question the juror alleged to have engaged in substantial misconduct every time there is an allegation of jury impartiality (see Smith v Phillips, 455 US 209, 217 [1982]). Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen" (id.). Indeed, "in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source" (United States v Angulo, 4 F3d 843, 847 [9th Cir 1993]). Thus,{**31 NY3d at 486} "while a court looking into juror misconduct must investigate and, if necessary, correct a problem, it must also avoid tainting a jury unnecessarily. . . . In this endeavor, sometimes less is more" (United States v Cox, 324 F3d 77, 88 [2d Cir 2003]). Here, the trial court determined the effect of the alleged prejudicial occurrence by calling the spectator to the stand and eliciting her sworn testimony. Such a procedure protected defendant's due process rights and ensured that the jury proceedings were not "jeopardized by unauthorized invasions" (Remmer v United States, 347 US 227, 229 [1954]).
We emphasize that our procedure set forth in Buford stands as the framework to evaluate sworn jurors who allegedly engaged in substantial misconduct preventing the rendering of an impartial verdict. Trial courts, when presented with some credible information indicating that a sworn juror may be grossly unqualified, must conduct a "probing and tactful inquiry" of the juror (see 69 NY2d at 299). However, if the trial judge determines, upon inquiry, that the allegation of misconduct is not credible, there is no reason to take the next step to address the nature of the alleged misconduct—whether it is premature deliberations, as in Mejias, or the preexisting bias of a juror. Unnecessarily confronting sworn jurors with unfounded, irrelevant, or incredible allegations of misconduct may impact the impartiality of the jury, and mandating such an intrusive procedure regardless of the particular circumstances of a case may only encourage untoward tactics intended to disrupt the proceedings. Accordingly, we must trust our trial courts to make the determination in the first instance as to whether to conduct an inquiry of a sworn juror. In so doing, a defendant's right to an impartial verdict is properly balanced with the jury's right to adjudicate "free from outside interference" (People v Rivera, 15 NY3d 207, 212 [2010]). Here, we conclude that the procedure [*5]followed by the trial court to first examine the spectator to ascertain the reliability of her allegation was not an abuse of discretion as a matter of law.
 Under our system of appellate review, every litigant is afforded at least one review of the facts (People v Bleakley, 69 NY2d 490, 494 [1987]). Since the Appellate Division did not consider the threshold issue—whether the trial judge was justified in finding the spectator incredible and therefore determining the Buford inquiry was not required—the case is remitted to that Court to consider and determine whether the trial court's credibility finding was supported by the weight of the{**31 NY3d at 487} evidence.[FN*] If, on remittal, the Appellate Division finds, upon its own factual review, that the record supports the trial court's determination that the spectator lacked credibility, no further action was required. If the Appellate Division finds that the credibility determination was not supported, it must determine whether the trial court abused its discretion in not taking further action (see e.g. Buford, 69 NY2d at 299; Mejias, 21 NY3d at 79-80). Contrary to the dissent's assertion, our decision does not detour from the guidance we provided in Buford. To be sure, a credible allegation that a juror is grossly unqualified to serve or engaged in substantial misconduct within the meaning of CPL 270.35 cannot be ignored by the trial court, and failure to appropriately remedy the matter is reversible error.
 Regarding the second issue presented on this appeal, the trial court did not commit reversible error by failing to state its express reasons for denying defendant's request for a Buford inquiry after the examination of the spectator (compare Buford, 69 NY2d at 299 [holding that the trial court's reasons for its determination following a Buford inquiry should be placed on the record]). While such practice is not required under our precedent, it remains the best practice to enhance appellate review.
Accordingly, the order of the Appellate Division should be reversed and the case remitted to that Court for consideration of the facts (CPL 470.25 [2] [d]; 470.40 [2]), and issues raised but not determined on the appeal to that Court.

Wilson, J. (concurring). I concur in the result, but believe that both the Appellate Division majority and dissent have evaluated this case under the wrong prong of CPL 270.35—"grossly unqualified to serve"—instead of the prong applicable here: "engaged in substantial misconduct." I would therefore reverse and remit so the Appellate Division could evaluate Mr. Kuzdzal's appeal under the correct prong, which it never considered.
CPL 270.35 (1) provides two distinct grounds requiring dismissal of a juror: when a juror (i) is "grossly unqualified to {**31 NY3d at 488}serve," or (ii) "has engaged in misconduct of a substantial nature." Mr. Kuzdzal asserted both grounds. "[T]he standard for excusing a sworn juror as 'grossly unqualified' within the meaning of CPL 270.35 is 'satisfied only "when it becomes obvious that a particular juror possesses a state of mind which would prevent the rendering of an impartial verdict" ' " (People v Cargill, 70 NY2d 687, 688 [1987][*6][citations omitted]).[FN1] We have previously held that "grossly unqualified to serve" and "engaged in misconduct of a substantial nature" are analytically distinct, inasmuch as preserving an argument as to the former does not preserve the latter (People v Hicks, 6 NY3d 737 [2005]).
Here, the Appellate Division analyzed Mr. Kuzdzal's claim under the "grossly unqualified" standard, which concerns the inability of a juror to decide a case impartially, when the facts alleged here pertain to the "misconduct" prong.[FN2] Mr. Kuzdzal's friend claims to have observed two jurors laughing and making faces at an unspecified point during the trial, and, after all the trial evidence had been presented, including Mr. Kuzdzal's testimony, to have overheard one of those two jurors state to the other that Mr. Kuzdzal was a "scumbag."
We ask jurors to enter a case with an open mind; to base their decision on the evidence at trial only; to decide the facts; to apply the law as given by the court; and not to discuss the case among themselves until they are charged. We do not ask them to avoid forming views—subject to the court's charge and later deliberations—as they hear the evidence, about the credibility of witnesses, which facts they believe, or guilt or innocence. We do not ask jurors, after they have heard all the evidence{**31 NY3d at 489} and before sending them off to deliberate, whether they think a defendant is a liar, crook, menace or scumbag, nor would we, because, as the majority and I completely agree, doing so would undermine the essence of the jury system (majority op at 
485-486, 486). We also do not ask because we want jurors to form opinions based on the evidence presented: that is their job. There is a fundamental difference between a juror who is biased and a juror who has formed opinions based on the evidence. The former is incompetent to sit; the latter has done exactly what is expected of a juror.
What evidence had the jurors heard before one told another that Mr. Kuzdzal was a scumbag? A five-year-old boy was dead. The boy's mother had been in a relationship with Mr. Kuzdzal since November 2012, and they shared an apartment together. She left her child in Mr. Kuzdzal's care while she went on errands. No one else was in the house when her son was injured, or at any time that day.
[*7]
When they arrived at the apartment, Mr. Kuzdzal told the first responders that the child had fallen down the basement stairs carrying a laundry basket, that he was only out of Mr. Kuzdzal's sight for about five minutes, and that about 20 minutes passed between when Mr. Kuzdzal discovered him at the bottom of the stairs and when the paramedics arrived.
Later, Mr. Kuzdzal gave a different account, saying that he smoked synthetic marijuana that afternoon and watched a movie for 45 minutes or an hour, and that he then went to check on the child and found him at the bottom of the basement stairs, unconscious. Mr. Kuzdzal reported that he brought the child upstairs and put him in a cold shower, hoping he would wake up, and remained in the bathroom with him for about 30 minutes. Mr. Kuzdzal claimed he then dressed the child, who remained unresponsive, and put him on the couch, at which point he was "throwing up nasty stuff" and Mr. Kuzdzal attempted to give him CPR, texted the child's mother and asked her what to do, and then called 911 upon her instruction.
Then, when asked about the injuries to the child's rectal area, Mr. Kuzdzal told one of the detectives that he would tell him the truth about what happened if the detective did not charge him with rape. Mr. Kuzdzal then amended his account again, saying that around 4:30 or 5:00 p.m., the child had urinated in his pants; Mr. Kuzdzal got angry and pushed him{**31 NY3d at 490} toward the shower, and that the child fell and hit his head on the side of the bathtub, but that he was fine and there was no bump on his head, and it was after that that the child fell down the stairs while he was carrying a laundry basket.
At trial, Mr. Kuzdzal gave a yet-different account of the child's death. Although he previously denied it, he testified that he had used heroin that morning and that he bought additional heroin early that afternoon. He further testified that when he pushed the child toward the shower and he hit his head, that the child was immediately unconscious. Mr. Kuzdzal admitted that he previously had lied to police repeatedly about what had happened that day.
The jurors also heard the following from other witnesses. The paramedics who responded to the 911 call testified that it was difficult to insert a breathing tube into the child's throat because there was so much blood in his airway. The emergency room doctor testified that when the child arrived his pupils were both dilated, fixed and unresponsive, and that his body temperature was very low, at 31.8 degrees Celsius. The doctor from the Pediatric Intensive Care Unit (PICU) at the hospital testified that a substantial amount of force would have been required to cause the fracture to the back of the child's skull. The surgeon who performed an emergency craniotomy on him testified that the appearance of his brain matter was not that of a child who had been recently injured, but one whose brain had been deprived of oxygen for hours.
After surgery, the PICU doctor conducted another examination and observed that the child was bruised on his nose, shoulders, arms, spine and rectal area, and had abrasions on his hips and rectal area. The sexual assault nurse examiner then examined him, and testified that he had sustained lacerations and bruising consistent with blunt force trauma and penetration of his rectum. A forensic biologist testified that the child's underwear was recovered from the apartment, and that a white-ish stain on them was tested for DNA material, which matched that of Mr. Kuzdzal. After the child died, the Erie County Medical Examiner's Office performed an autopsy, and the Medical Examiner testified that all of the injuries occurred at about the same time, and that the cause of the child's death was blunt impact trauma to the head.
If we could read the minds of jurors, would we remove from the jury any who, at the close of evidence, believed Mr. Kuzdzal was a scumbag? Of course not. The problem here is that{**31 NY3d at 491} one juror said so to another, in violation of the court's daily admonition that jurors should not discuss the case amongst themselves or with anyone else. Nothing about Mr. Kuzdzal's friend's observation raises any inference that a juror was biased or grossly unqualified to serve, but instead that two jurors engaged in premature deliberations.
[*8]In People v Mejias, we held that premature deliberation does not necessarily require removal of a juror, nor does it even necessarily trigger a Buford inquiry (21 NY3d 73, 79-80 [2013]).[FN3] Our standard that the misconduct must be "substantial" (or that a juror must be "grossly unqualified"), as well as the procedure we laid out in People v Buford (69 NY2d 290 [1987]), are safeguards against tampering with the jury. We have long held that such protection is crucial.[FN4]
In my view, then, a proper application of CPL 270.35 requires that the Appellate Division evaluate Mr. Kuzdzal's claim under the "substantial misconduct" prong only. (In that regard, it is worth noting that Supreme Court's questioning of Mr. Kuzdzal's friend was principally directed at exhausting the substance of what she knew, not her credibility; the prosecutor's questions were directed at credibility.){**31 NY3d at 492}
I therefore concur in the judgment.

Rivera, J. (dissenting). This appeal involves allegations that empaneled jurors made disparaging remarks and acted in a manner that suggested they were "grossly unqualified" to continue serving on defendant Matthew Kuzdzal's jury, and the trial court should thus have made an inquiry of the jurors to determine if they had to be discharged pursuant to Criminal Procedure Law § 270.35 (1). Law and the record below amply support the Appellate Division's decision that there was credible information of possible juror bias before the trial court and that the court therefore erred in denying defendant's motion to inquire of the jurors.
I agree with the majority that there may be situations when a trial court should assess the credibility of allegations of juror misbehavior in deciding whether to conduct the individual juror inquiry necessitated by CPL 270.35 (1) and mandated by People v Buford (69 NY2d 290 [1987]). However, I disagree with the majority's view that if the Appellate Division determines, contrary to the trial court, that the allegations are credible, the Appellate Division—or this Court—could let stand the trial court's erroneous decision not to inquire after possible juror bias. There is no reading of New York's Constitution, the CPL, or our case law that would allow a court to permit a potentially grossly unqualified juror to deliberate on a defendant's guilt or innocence.
I dissent because the majority's remittal to the Appellate Division is unnecessary, as there is no error by that Court within our authority to correct. Even if I agreed that some error taints the Appellate Division's decision, I could not join the majority, since its directive is inconsistent with the logic of its own opinion and of the holding below.
I.
At defendant's trial, between summations and the jury charge, defense counsel approached the bench for an off-the-record conference. The court then called to the stand a trial observer—a lifelong friend of the defendant—who had been in and around the courtroom. The observer testified under oath that she and a friend heard two jurors, whom she specifically identified, refer to the defendant by a derogatory term. The observer further testified that the same two jurors had been laughing and making faces during trial.{**31 NY3d at 493}
After the testimony, defense counsel asked the court to make an inquiry of the jurors. In response, the prosecutor opined that the testimony did not meet the standard necessitating an inquiry and that the court should decide first whether the observer's testimony was credible. The trial judge then stated that, based on what he had heard, "I don't believe that an inquiry of the juror is necessary or appropriate." The court noted defense counsel's objection and called in the jury for final instructions before deliberations.
On appeal, the Appellate Division made two determinations relevant to the trial court's denial of defendant's motion to inquire. First, the Appellate Division found record support of possible juror bias (see 144 AD3d 1618, 1621 [4th Dept 2016] ["We respectfully disagree with our dissenting colleagues that the court lacked sufficient credible information indicating the possibility of juror bias"]). Second, the Appellate Division concluded that, based on the observer's testimony, the trial court should have inquired of the jurors to determine whether they were "grossly unqualified" and should have been discharged (see id. ["Based on the record before us, we are compelled to conclude that the jurors' alleged reference to defendant as a 'scumbag' indicated the possibility of juror bias, and thus that the court should have granted defendant's request to make an inquiry of the jurors"]).
The Appellate Division's first determination—about the existence of credible information before the court—was a purely factual determination based on its review of the record. Our power to review that determination is strictly limited (see generally Arthur Karger, Powers of the New York Court of Appeals §§ 21:6, 21:10 [3d ed rev 2005]). Indeed, if the Appellate Division made its own assessment of the credibility of the witness, it made a purely factual judgment, which we have no power to revise at all (see People v Albro, 52 NY2d 619, 624 [1981]; People v Richardson, 41 NY2d 886, 887 [1977], citing People v Concepcion, 38 NY2d 211, 213 [1975]).[FN1]
The second determination—that the observer's testimony met the standard for requiring an inquiry of the jurors—was clearly a decision on a question of law. The Appellate Division{**31 NY3d at 494} held that it believed the alleged jurors' conduct rose to the level that would require an inquiry of the jurors by the court to ensure compliance with CPL 270.35 (1). I agree.
A defendant's right to trial by an impartial jury is guaranteed by our Constitution and the CPL (see NY Const, art I, § 2; CPL 270.35 [1]; People v Spencer, 29 NY3d 302, 309 [2017] [observing that "(t)he constitutional right of a criminal defendant to a fair trial includes . . . the right to an impartial jury" and noting the "several safeguards in place to protect that right," including CPL 270.35 (internal quotation marks and citations omitted)]). CPL 270.35 (1) provides that, "[i]f at any time after the trial jury has been sworn and before the rendition of its verdict . . . the court finds . . . that a juror is grossly unqualified to serve . . . or has engaged in misconduct of a substantial nature . . . the court must discharge such juror." In Buford the Court adopted a procedure to assess whether a juror must be disqualified in accordance with this provision, intending "to create a framework by which trial courts could evaluate sworn jurors who, for some reason during the trial, may 'posses[ ] a state of mind which would prevent the rendering of an impartial verdict' " (People v Mejias, 21 NY3d 73, 79 [2013], quoting Buford, 69 NY2d at 298). Under that framework,
"the trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant. Counsel should be permitted to participate if they desire. In a probing and tactful inquiry, the court should evaluate the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case. In this context, the court should carefully consider the juror's answers and demeanor to ascertain whether [the juror's] state of mind will affect [the juror's] deliberations" (Buford, 69 NY2d at 299).
[*9]
Another essential part of this framework is the creation of a record of the trial court's decision and underlying reasoning (see id. ["The trial court's reasons for its ruling should be placed on the record"]).
Allegations that two jurors referred to the defendant by the derogatory term "scumbag" and laughed and made gestures during trial raised the possibility that they were no longer impartial or had become close-minded, and thus were unable to properly fulfill their role as unbiased finders of fact (see{**31 NY3d at 495} Spencer, 29 NY3d at 304 [observing that where a juror is clearly "unable to render an impartial verdict based solely on the evidence and the law" the juror should be discharged under CPL 270.35 (1)]). The trial court was therefore obligated to conduct an inquiry of these jurors to determine whether they were in fact "grossly unqualified" and so should have been discharged. It is uncontested that no such inquiry occurred, and, as the Appellate Division concluded, without such inquiry the fairness of the conviction remains in doubt (144 AD3d at 1621 ["(I)t might have been that removal of the juror(s) would have been unnecessary if a specific inquiry had been made by the court or counsel, but in the absence of such an inquiry, we cannot be certain that the defendant was fairly convicted" (quoting People v Ventura, 113 AD3d 443, 446 [1st Dept 2014])]). The Appellate Division therefore properly reversed the trial court and ordered a new trial.
II.
The majority misreads the Appellate Division decision and so now unnecessarily remits to that court "to consider and determine whether the trial court's credibility finding was supported by the weight of the evidence" (majority op at 
486-487). It is not clear what error the Appellate Division actually committed, though, or what effect, if any, the ordered reconsideration will have on its disposition of the case. Moreover, the "weight of the evidence" standard adopted by the majority is referenced without citation or explanation as to its applicability to an assessment of a sworn juror's qualifications.
A.
As the majority expressly confirms, it holds that the Appellate Division did not make any judgment about the trial court's credibility determination, or reach its own independent determination as to the import of the allegations. This conclusion is hard to square with the text, structure, and holding of the Appellate Division's decision. As quoted above, the Appellate Division opinion includes language that shows it considered the allegations of the observer, and found that they "indicated the possibility of juror bias," which required that the trial judge make an inquiry of the jurors (144 AD3d at 1621). Indeed, the entire organization of the Appellate Division writing is predicated on it having assessed the record before it and concluded that the allegations warranted the inquiry.{**31 NY3d at 496}
Read in context, moreover, it is clear that the Appellate Division majority was responding to the dissent, which argued that "[t]he record fully supports th[e trial court's] determination" that the "spectator's testimony was not sufficiently credible" (144 AD3d at 1624 [Smith, J.P., and Peradotto, J., dissenting]). The Appellate Division majority considered this claim and rejected it, concluding that, contrary to the dissent's assertion, there was "sufficient credible information [before the trial court] indicating the possibility of juror bias" (144 AD3d at 1621). The only possible source in the record for that "credible information" was the testimony of the observer. The holding of the Appellate Division would be incomprehensible if that Court had not determined that the observer's allegations were credible enough to support an inquiry.
The majority also misconstrues the meaning of the Appellate Division's characterization of the trial court's ruling as "conclusory" (id.). This statement is a response to the dissent's contention that the trial court's reasoning is obvious from the record (see 144 AD3d at 1624 [Smith, J.P., and Peradotto, J., dissenting]). The Appellate Division majority was clarifying that, without an explanation—as required by Buford—the basis of the trial court's denial of defendant's motion remains unclear. That assessment is wholly correct. It could be the case that the trial court concluded that the observer was not believable, as the dissent argued, or that what the observer alleged, even if believable, simply did not raise the possibility that the jurors were "grossly unqualified." However, since "the court did not explain on the record its [*10]reasons for denying defendant's request," the Appellate Division could not conclude which logic path the trial court followed (144 AD3d at 1621). The trial court's ruling was thus "conclusory and, contrary to the People's contention, did not constitute an implied determination that the observer's testimony was incredible" (id.). In the context of the opinion, it is clear that the Appellate Division did not hold that "the trial court made no findings . . . as to the spectator's credibility" (majority op at 
482). Rather, the Appellate Division held that it is not logically correct to claim, as the dissent asserted, that because the trial court rejected defendant's request for an inquiry of the jurors, it necessarily did so upon a finding that the observer was not believable.
B.
Even accepting the majority's interpretation of the case, its decision to remit is inexplicable. Assuming that, as the majority{**31 NY3d at 497} argues, the Appellate Division failed to review the trial court's findings of fact, there is nevertheless no question that the Appellate Division concluded there was sufficient credible information before the trial court to require a Buford inquiry. The majority does not appear to disagree with the Appellate Division that the allegations here, if true, would meet that standard.[FN2] If the majority did [*11]disagree, it could simply reverse the Appellate Division outright without remitting. However, by remitting the case, the majority today implicitly endorses the Appellate Division's conclusion of law—its second determination—that the alleged conduct required the court to conduct an inquiry of the jurors.
What the majority intends the Appellate Division to do differently when it receives this case on remand is unclear. The{**31 NY3d at 498} Court has already opined that credible grounds exist to require the trial court to conduct a Buford inquiry. Presumably, regardless of how it assesses the trial court's credibility determination, it will not depart from its prior judgment on remand since it will have before it the very same record it used to make its first determination.
The majority suggests that the trial court might have "discretion" to forgo an individual inquiry even if it found the observer's allegations credible (see majority op at 
487). As I discuss below (see infra part IV), this is mistaken, but, in any case, here the Appellate Division has already held as a matter of law that the observer's allegations rose to the level of requiring an individual inquiry. Even if the trial court had "discretion" to conduct an inquiry—which I dispute—then the Appellate Division has already implicitly held that it would be an abuse of discretion not to conduct one here, based on the allegations. The majority does not challenge this conclusion, and it is not clear from the majority's opinion what error the Appellate Division made that would make any difference to the outcome of this case.
III.
At the heart of the majority's opinion is an interpretation of the case record. The majority reads the trial transcript and concludes that "the trial court made an implied credibility finding that the [observer] was not worthy of belief" (majority op at 
480). Our Court sits as a court of law; this conclusion, then, must itself be a decision on the law. To that extent, we have the power to review the record for legal sufficiency, in order to determine that the trial court's action was, in fact, a credibility judgment. This, however, is where our analysis must end. Once we have read the record and found that the trial court did make a credibility determination, we may not evaluate that determination itself or otherwise assess the evidence on which it was based.
[*12]
The majority today goes further, though. Part of the evidence the majority opinion relies on for concluding that the trial court made a credibility determination is that "the spectator's testimony was inconsistent" (majority op at 
481). In other words, the majority today uses the fact that the observer was inconsistent as evidence for the proposition that the trial judge made an implicit credibility determination. Yet, it is not for us to opine on whether the observer was inconsistent or not. Our{**31 NY3d at 499} Court does not generally have the power to make findings of fact (Karger § 1:3). In a civil case, where the trial court makes one factual finding, and the Appellate Division evaluates and rejects it in favor of another, our Court may properly review the competing factual findings to determine which of the two better comports with the weight of the evidence (see e.g. Dryden Mut. Ins. Co. v Goessl, 27 NY3d 1050 [2016]). We have no such power in criminal cases, though (see Karger §§ 21:6, 21:10), and in any case the majority here plainly finds that the Appellate Division did not assess the trial court's factual findings at all. Under the circumstances, the majority's statements must be dicta.
IV.
To the extent that the majority is expounding on the procedure a court should follow to determine whether a juror must be discharged, I agree that in some situations a trial judge must first assess the credibility of the allegations that a juror may be "grossly unqualified" before proceeding to an inquiry of the juror. This is plainly congruent with New York precedent, which recognizes that, depending on the allegations and facts presented to a trial court, an inquiry of the juror may not be necessary (cf. Buford, 69 NY2d at 299 and n 4 [allowing an exception to the presumption that the "trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant" "in the unusual case involving an obviously trivial matter where the court, the attorneys, and defendant all agree that there is no possibility that the juror's impartiality could be affected"]; Mejias, 21 NY3d at 79-80 [affirming a court's decision to issue an instruction to the whole jury instead of question individual jurors where "there (was) no indication from the (allegations) that the . . . impartiality (of the jurors) was in doubt or that the juror(s) had committed any misconduct"]; People v Matiash, 197 AD2d 794, 796 [3d Dept 1993] [affirming a trial court's decision not to interrogate jurors individually where, after interrogating a witness who alleged he had overheard juror misconduct, the court concluded that the alleged behavior, even if it had actually occurred, was "essentially innocuous"]).
Such assessment should be limited, however. Faced with allegations that a juror is potentially grossly unqualified, a trial judge might need to assess the credibility of the person making those allegations, whether the source is another juror, court{**31 NY3d at 500} personnel, or an observer—for example, where the alleged conduct occurred in open court and yet neither the trial judge nor attorneys can confirm the allegations. An investigation could assess two different kinds of credibility. A court might need to determine whether the allegations of juror misconduct are truthful—that is, whether the person making the allegations is being truthful. A court might also need to determine whether the allegations are accurate—that is, whether the observer has simply made a mistake, for example, where the complainant has poor eyesight and the allegation is based on what was seen, or the complainant misheard a comment and the allegation is based on what was said.
Evaluating credibility in these two ways is not the only salutary effect of a trial judge's assessment of allegations of juror misconduct. Through this process, a judge may determine not only whether an inquiry of jurors is necessary, but also what the bounds of that inquiry should be, how to make that inquiry "probing and tactful" as required by Buford (69 NY2d at 299), as well as whether the alleged misconduct can be resolved through other means, such as a curative instruction to the jury as a whole (see Mejias, 21 NY3d at 80).
The majority's opinion today is deficient in the guidance it offers on how to conduct this assessment in two respects. First, the majority suggests that, even after a trial court has determined allegations of juror misconduct to be credible and that those allegations suggest the possibility that a juror is grossly unqualified, the court might still have discretion not to conduct a further inquiry or discharge a juror (see majority op at 
487). The Criminal Procedure Law is unambiguous, however, that if a juror is "grossly [*13]unqualified," the trial court "must discharge such juror" (CPL 270.35 [1] [emphasis added]). The decision about whether to discharge a juror, then, and so whether to conduct a further inquiry to determine whether such juror must be discharged, is not discretionary at all, but mandated by statute (Buford, 69 NY2d at 297-298 [discussing the "statutory scheme" that requires "the court must discharge (grossly unqualified) juror(s)"]; Mejias, 21 NY3d at 79 [observing that Buford "create(d) a framework by which trial courts . . . evaluate sworn jurors" to determine whether they must be discharged pursuant to the statutory mandate of CPL 270.35 (1)]).
Second, the majority characterizes the creation of a record of the trial court's reasoning as merely a "best practice to enhance {**31 NY3d at 501}appellate review" (majority op at 
487). In my view an express record of a trial court's reasons for whether to inquire of a juror is required by both the language and logic of Buford. Our Constitution and the Criminal Procedure Law provide for appellate review of the trial court's legal decision (see NY Const, art VI, § 3 [b]; CPL 470.35). Meaningful and effective review is only possible, however, with the benefit of a complete record, especially since appellate courts will rightly defer to trial court findings of fact and credibility (see e.g. Matter of Jamal V., 159 AD2d 507, 508 [2d Dept 1990] [where a "case was tried before a court without a jury . . . the greatest respect must be accorded the determination of the hearing court in assessing the credibility of witnesses and resolving disputed questions of fact" (citations omitted)]). For those reasons, the Court has long held that, when it comes to decisions about removing jurors pursuant to CPL 270.35 (1), "[t]he trial court's reasons for its ruling should be placed on the record" (Buford, 69 NY2d at 299). That logic applies with even more force to credibility determinations, which often depend on visual observations and cues that are not obvious from a cold transcript (cf. People v Romero, 7 NY3d 633, 645 [2006] [observing that "the memory, motive, mental capacity, accuracy of observation and statement, truthfulness and other tests of the reliability of witnesses can be passed upon with greater safety by those who see and hear than by those who simply read the printed narrative" (brackets omitted)]). Without citation or reason, the majority has defanged Buford, and discouraged the type of clarity of analysis necessary for appellate review.
V.
Although a trial court may conduct an assessment of an observer's allegations before proceeding to the "probing and tactful" inquiry our case law requires, I do not think the majority's rule is well crafted, and do not think it has been properly applied to this case. The majority today remits on the basis of a misreading of the Appellate Division decision. The conclusion it asks that Court to draw on remand, it has, in fact, already reached. Accordingly, I dissent.
Chief Judge DiFiore and Judges Stein, Garcia, Wilson and Feinman concur; Judge Wilson in a concurring opinion; Judge Rivera dissents and votes to affirm in an opinion; Judge Fahey taking no part.{**31 NY3d at 502}
Order reversed and case remitted to the Appellate Division, Fourth Department, for consideration of the facts (CPL 470.25 [2] [d]; 470.40 [2]) and issues raised but not determined on appeal to that Court.

Footnotes

Footnote *:Contrary to the dissent's assertion, our opinion does not disregard the prohibition on this Court "from weighing facts and evidence in noncapital cases" (see People v Jones, 24 NY3d 623, 630-631 [2014]). However, we do consider the factual record to the extent that it is a foundation for the application of law (id. at 631). As we stated herein, the record reveals that the Appellate Division did not exercise its independent factual review power of the trial court's threshold credibility finding. Thus, we remit the case to that Court to do so (see CPL 470.15).

Footnote 1:"Grossly unqualified" may also include cases in which a juror is unable to understand the proceedings (see People v Sanchez, 99 NY2d 622, 623 [2003] [juror considered potentially grossly unqualified when she said "she didn't understand the lawyers and she didn't understand the judge," and the court's inquiry, which focused on her age, citizenship, and whether she could understand English, was insufficient]).

Footnote 2:In different circumstances, a derogatory comment by a juror might indeed raise an inference of bias. For example, had the juror called Mr. Kuzdzal a scumbag before opening statements, the statement would raise an inference that the juror was biased. Had the juror, after the close of evidence, said that Mr. Kuzdzal was a dealer in illegal firearms (which would be a complete fabrication), the court should have been concerned about both bias and misconduct. Here, however, the juror's alleged statement, made after the jury heard voluminous evidence of Mr. Kuzdzal's conduct, does not suggest bias, though it would be misconduct.

Footnote 3:The circumstances in Mejias are very similar, though not identical, to those present here. In Mejias, a juror note stating that "we" wanted to know something suggested that the jury had been discussing the case. The trial court then reminded the jurors they were not to discuss the case until deliberations began, and asked jurors who had "started discussing the evidence" to raise their hands (21 NY3d at 78). None did. Here, at the very end of the day in which the "scumbag" comment allegedly took place, the court admonished the jurors, "Don't discuss the case among yourselves or with anybody else. Make sure you let me know of any attempt by anyone to discuss it with you."

Footnote 4:
" 'The history of the law,' as was well observed in the case of O'Brien agt. Merchants' Fire Insurance Company (38 N. Y. Sup. C. R.), 'discloses a struggle for centuries, to prevent juries from being approached by improper communications;' and I think it is as essential to the important and effective administration of justice, that the opinions and instructions of the court should be openly and publicly imparted, so far as litigants are concerned, as that the deliberations of the jury should be conducted with secrecy and in seclusion. Repeated infractions of this salutary rule, in exceptional instances, varied in accordance with the exigencies of each particular case, would gradually fritter it away, and ultimately effect its complete abrogation. It should be permanent and immutable. If trial by jury is to 'remain inviolate forever,' every safeguard to its sanctity must be jealously upheld" (Plunkett v Appleton, 51 How Prac 469, 473 [1876]).
Footnote 1:If the Appellate Division's factual determination reversed an underlying trial court factual determination, and that factual determination was the basis of the Appellate Division's judgment, then not only may we not review that determination, but the appeal itself would not lie and should therefore be dismissed (see Karger § 21:10).

Footnote 2:The concurrence, by contrast, observes explicitly that "[n]othing about Mr. Kuzdzal's friend's observation raises any inference that a juror was biased or grossly unqualified to serve," and asserts that the alleged behavior, at most, reflects "that two jurors engaged in premature deliberations" (concurring op at 
491). This begs the question. From the cold record, we simply cannot know whether the jurors' statements and actions betrayed bias, close-mindedness, or (as the concurrence assumes) premature deliberation. It is for this very reason that our case law requires judges to investigate allegations that implicate the impartiality of the jury, to determine whether jurors are competent to continue their service. This is true regardless of whether the allegations suggest that a juror is "grossly unqualified to serve" or "engaged in substantial misconduct," whether those two prongs are truly distinct or not.
In any case, this Court has never held that a trial court may simply ignore a juror's premature deliberation, only that "[p]remature deliberation . . . , by itself, does not render a juror grossly unqualified" (Mejias, 21 NY3d at 79). To the contrary, Mejias held that a trial court faced with even equivocal evidence of possible premature deliberations "did what was warranted; namely, it issued an additional instruction to the jurors reminding them that they were not to deliberate prior to being charged" (id.). There may be cases where premature deliberation requires a different response by the trial court. Or premature deliberation, in combination with other conduct, might be evidence that jurors are grossly unqualified, insofar as the prematurely deliberating jurors have shown themselves unable to follow instructions from the court, or because the premature deliberations might lead to their becoming close-minded, and so require their discharge from the jury. "[E]ach case must be evaluated on its unique facts to determine whether a particular juror must be disqualified under CPL 270.35" (Buford, 69 NY2d at 299). What remains constant is the court's adherence to the procedural safeguards of Criminal Procedure Law article 270, which exist to ensure a defendant's constitutional right to a fair and impartial jury, and require a trial court's effective response to potential juror partiality, bias, and prejudice, in all its forms. That is the case here because calling a defendant a "scumbag" is not merely a sign of possible unsanctioned deliberation but a formed opinion about the defendant's character that may taint the jurors' factual assessment of defendant's guilt.