People v Fisher (2023 NY Slip Op 00248)

People v Fisher

2023 NY Slip Op 00248

Decided on January 19, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:January 19, 2023

111188
[*1]The People of the State of New York, Respondent,
v
Kenneth E. Fisher, Appellant.

Calendar Date:November 16, 2022

Before:Egan Jr., J.P., Lynch, Aarons, Reynolds Fitzgerald and McShan, JJ.

Lisa A. Burgess, Indian Lake, for appellant.
Weeden A. Wetmore, District Attorney, Elmira (John D. Kelley of counsel), for respondent.

Reynolds Fitzgerald, J.
Appeal from a judgment of the County Court of Chemung County (Christopher P. Baker, J.), rendered February 4, 2019, upon a verdict convicting defendant of the crime of criminal sale of a controlled substance in the third degree (three counts).
Defendant was charged, by two separate indictments, with three counts of criminal sale of a controlled substance in the third degree — in connection with two "controlled buy" operations involving a confidential informant (hereinafter the CI) that occurred on February 7 and February 13, 2018 — and with two counts of criminal possession of a controlled substance in the fourth degree. The indictments were consolidated and, following a jury trial, defendant was convicted of each count of criminal sale of a controlled substance in the third degree but was acquitted of the two counts of criminal possession of a controlled substance in the fourth degree. Defendant was sentenced, as a second felony offender, to a prison term of 4½ years on each conviction — with the convictions on counts 1 and 2 to run consecutively and the convictions on counts 2 and 3 to run concurrently — for a total prison term of 9 years, followed by three years of postrelease supervision. Defendant appeals.
Defendant contends that the verdict is against the weight of the evidence because no witness actually observed him selling the cocaine to the CI. "A weight of the evidence review requires this Court to first determine whether, based on all the credible evidence, a different finding would not have been unreasonable. Where a different finding would not have been unreasonable, this Court must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Sumpter, 191 AD3d 1160, 1161 [3d Dept 2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 968 [2021]; see People v Montford, 207 AD3d 811, 812 [3d Dept 2022], lv denied 39 NY3d 941 [2022]).
At trial, the People produced testimony from several law enforcement officers and the recordings of the controlled buys.[FN1] An investigator with the State Police working with Community Narcotics Enforcement Team (hereinafter CNET), described the general procedure involved in a controlled buy operation involving a CI. He testified that an undercover agent was present during both of these controlled buys and that numerous members of law enforcement were surveilling same. As to the February 7, 2018 controlled buy, he testified that defendant was the intended target and that he and other law enforcement officers were familiar with defendant and that he drove a Mercedes. The investigator detailed how he conducted the strip searches of the CI and confirmed that the CI did not have any personal funds or personal narcotics on him. He also accompanied the CI to the area where the CI called defendant to arrange the buy, then [*2]surveilled the controlled buy and observed that the only occupant in the Mercedes was the driver. The investigator then field tested the narcotic, which tested positive for cocaine. Regarding the February 13 controlled buy, the investigator testified that he witnessed the CI being strip searched and fitted with a body wire, gave the CI and undercover agent the funds to purchase the drugs and again accompanied the CI while he placed the controlled call to arrange the buy. The investigator watched the controlled buy in the Tops parking lot and observed defendant driving the vehicle. At the conclusion of the controlled buy, he followed the CI and undercover agent to the area where the CI was once again strip searched. The investigator also testified that a cell phone was seized from defendant and when he called the number that the CI had used to contact defendant, the cell phone rang.
A lieutenant with the Elmira Police Department (hereinafter EPD) testified that he was involved in the February 13, 2018 controlled buy. He stated that his role was surveillance at the apartment complex where defendant resided. He observed and took pictures of defendant and his relative leaving the apartment and getting into a Mercedes. He testified that defendant was the driver and defendant's relative was the passenger. The lieutenant described defendant as having short hair and his relative as having long dreadlocks. The photographs corroborated his testimony.
A senior investigator with the State Police assigned to CNET testified that he was the undercover agent working with the CI during the February 7, 2018 controlled buy. He stated his role was to drive the CI to and from the buy location and to possibly be introduced to the target. The senior investigator testified that he drove the CI to an area where the controlled call was placed to purchase the drugs, drove the CI to Tops parking lot and watched the CI enter and exit defendant's Mercedes. The investigator indicated that he did not get a full view of the driver, but observed that the only occupant was the driver and that he had short hair. At the conclusion of the controlled buy, he saw the CI give the narcotics to an investigator. A State Police officer assigned to CNET testified that he was the undercover agent working with the CI during the February 13 controlled buy. He stated that he drove the CI to the area to place the controlled telephone call, then drove the CI to Tops parking lot to purchase the narcotics. He testified that there were two individuals in defendant's Mercedes — defendant was driving the vehicle and his relative was a passenger. When the CI returned to their truck a second time, the CI told the officer to back up the truck so defendant can look at him. The officer testified that defendant's vehicle and his vehicle were approximately 10 feet apart and he was able to get a good look at defendant and his passenger. The officer identified the driver as defendant. He further testified that [*3]he collected two cocaine knots from the CI and put it in the truck's console until they returned to the area where the CI was to be strip searched.
An EPD officer, assigned to the drug enforcement unit, testified that he was assigned to surveil both the February 7 and February 13, 2018 controlled buys. At the conclusion of the February 7 buy, he observed defendant — who was the only person in the vehicle — leaving Tops parking lot. During the February 13 buy, he observed defendant driving the vehicle, along with a second person who was a passenger, exit the Tops parking lot at the conclusion of the buy. The officer identified the driver as defendant and stated that he knew defendant from the gym. An investigator with the EPD testified that he transported the CI to the area to place the February 7 and the February 13 controlled calls. The investigator further testified he recorded each call, downloaded them onto two disks and described the contents of each call when played at trial.
Although a different verdict would not have been unreasonable, when viewing the evidence in a neutral light and according deference to the jury's credibility determinations, we conclude that the verdict is not against the weight of the evidence (see People v Sumpter, 191 AD3d at 1162-1163; People v McMillan, 185 AD3d 1208, 1211 [3d Dept 2020], lv denied 35 NY3d 1114 [2020]). The testimony established that defendant was the only person in the vehicle during the February 7, 2018 controlled buy, and was identified as the driver leaving the Tops parking lot immediately upon completing the controlled buy. The testimony also established that defendant was identified as the driver of the vehicle during the February 13 controlled buy, and was observed turning and communicating with the CI during the buy. Defendant was also observed by multiple officers during and immediately after each controlled buy (see People v McMillan, 185 AD3d at 1210-1211; People v Small, 174 AD3d 1130, 1132 [3d Dept 2019], lv denied 34 NY3d 954 [2019]; People v Morris, 165 AD3d 1489, 1490 [3d Dept 2018], lv denied 32 NY3d 1207 [2019]).
Defendant next contends that County Court improperly denied his motion for a mistrial on the ground that one of the trial jurors was grossly unqualified to serve. Pursuant to CPL 270.35 (1), "[i]f at any time after the trial jury has been sworn and before the rendition of its verdict, . . . the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case . . ., the court must discharge such juror." A juror is considered grossly unqualified to serve "when it becomes obvious that he or she possesses a state of mind which would prevent the rendering of an impartial verdict" (People v Alger, 206 AD3d 1049, 1054 [3d Dept 2022] [internal quotation marks, brackets and citations omitted], lv denied 38 NY3d 1148 [2022]). "To decide whether a juror is grossly unqualified, the trial court must conduct a probing [*4]and tactful inquiry" (People v Crider, 176 AD3d 1499, 1500 [3d Dept 2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 1157 [2020]). "As the trial court is in the best position to observe the jury and assess the state of mind and alleged partiality of an allegedly biased juror, its determination as to whether a juror is grossly unqualified to serve is entitled to great deference" (People v Montes, 178 AD3d 1283, 1288 [3d Dept 2019] [citations omitted], lv denied 34 NY3d 1161 [2020]). "Generally, the decision to grant or deny a motion for a mistrial is within the trial court's discretion and its decision will not be disturbed unless it amounts to an abuse of discretion" (People v Silver, 168 AD3d 1225, 1227 [3d Dept 2019] [internal quotation marks and citations omitted], lv denied 33 NY3d 954 [2019]).
After jury deliberations began, County Court received a note stating, "[c]onfidential, one juror feels she may have been followed home Monday by [defendant]." After determining the identity of the juror in question, the court conducted an on the record, in camera inquiry of juror No. 6. Said inquiry was conducted in the presence of the attorneys and defendant and with their participation. The juror stated that she was "95% certain" that defendant followed her as she had spotted his car approximately six to eight car lengths behind her. Although this incident occurred during the trial, the juror did not immediately inform the court. Instead, she only came forward after other jurors, in the course of deliberations, had expressed safety concerns regarding trial spectators and, upon hearing her recount the incident, encouraged her to come forward. In response to the court's questioning, she then stated unequivocally that she could put this incident aside, it would not affect her ability to remain on the jury, and that she would determine the case solely on the evidence and the legal instructions given to her by the court. Notably, at that time, the court specifically asked if counsel had any applications to make and defendant did not move for a mistrial.
After County Court finished rereading instructions to the jury, defendant approached the court with concerns regarding the jurors allegedly feeling threatened, posited that this fear indicated implicit racial bias, and moved for a mistrial. The court denied the motion. Thereafter, defendant requested that the court question each juror. The court then conducted a private colloquy of each juror, again on the record in the presence of counsel and defendant. At the conclusion of the colloquies there were no further applications, until defendant's CPL 330.30 motion to set aside the verdict asserting a mistrial on the grounds of a grossly unqualified juror.
Upon review of the private colloquy between County Court and juror No. 6, we disagree with the dissent's view that County Court failed to engage in a probing and tactful inquiry taking into due account the juror's responses. "The[*5][t]rial [j]udge generally is accorded latitude in making the findings necessary to determine whether a juror is grossly unqualified under CPL 270.35, because that [j]udge is in the best position to assess partiality in an allegedly biased juror" (People v Rodriguez, 71 NY2d 214, 219 [1988] [citation omitted]; see People v Leader, 285 AD2d 823, 824 [3d Dept 2001], lv denied 97 NY2d 756 [2002]). The trial court is tasked with "evaluat[ing] the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case" (People v Buford, 69 NY2d 290, 299 [1987]). County Court, "[i]n concluding that a juror is grossly unqualified, . . . may not speculate as to possible partiality of the juror based on [his or] her equivocal responses. Instead, it must be convinced that the juror's knowledge will prevent [him or] her from rendering an impartial verdict" (id.). This Court likewise should not speculate. County Court was in the best position not only to assess the juror's oral assertions but also her demeanor — which cannot be assessed via perusal of a trial transcript. Moreover, we recognize that in questioning the juror, the trial court walks a fine line and must "avoid tainting a jury unnecessarily. In this endeavor, sometimes less is more" (People v Batticks, 35 NY3d 561, 566 [2020] [internal quotation marks, ellipsis and citations omitted]). Accordingly, deferring to County Court's ability to observe the jury and assess juror No. 6's state of mind and alleged impartiality, we cannot say that County Court's denial of defendant's motion for a mistrial constituted an abuse of discretion (see People v Montes, 178 AD3d at 1290; People v Crider, 176 AD3d at 1501). Defendant's present contention that County Court erred with respect to juror No. 3, a contention that is addressed at length by the dissent, is unpreserved for our review (see People v Keener, 138 AD3d 1162, 1165 [3d Dept 2016], lv denied 27 NY3d 1134 [2016]; People v Lee, 129 AD3d 1295, 1299 [3d Dept 2015], lv denied 27 NY3d 1001 [2016]; People v Fleegle, 20 AD3d 684, 685 [3d Dept 2005], lv denied 5 NY3d 828 [2005], cert denied 547 US 1152 [2006]), and we decline to exercise our interest of justice jurisdiction to reverse on this issue.
Egan Jr., J.P. and McShan, J., concur.
Lynch, J. (concurring in part and dissenting in part). We agree with the majority's determination, with one exception. In People v Buford (69 NY2d 290 [1987]), the Court of Appeals set the standard for evaluating an issue of juror disqualification under CPL 270.35. In such a situation, "the trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant. Counsel should be permitted to participate if they desire. In a probing and tactful inquiry, the court should evaluate the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case. In this [*6]context, the court should carefully consider the juror's answers and demeanor to ascertain whether [his or] her state of mind will affect [his or] her deliberations. The trial court's reasonsfor its ruling should be placed on the record. In concluding that a juror is grossly unqualified, the court may not speculate as to possible partiality of the juror based on [his or] her equivocal responses. Instead, it must be convinced that the juror's knowledge will prevent [him or] her from rendering an impartial verdict" (People v Buford, 69 NY2d at 299 [footnote omitted and emphasis added]). Applying that standard here, under the unique circumstances presented, it is our view that County Court erred in denying defendant's motion for a mistrial pursuant to CPL 270.35 (1).
During jury deliberations on a Thursday afternoon, County Court received a note from the foreperson stating, "[c]onfidential, one juror feels she may have been followed home Monday by [defendant]." In response, the court appropriately conducted an inquiry with the concerned juror, with counsel present. The following exchange took place:
THE COURT: The foreperson had indicated in a note to us that you had felt that Monday, after jury selection, that you may have been followed home by [defendant]?
JUROR SIX: Yes.
THE COURT: What leads you to believe that?
JUROR SIX: Because I could see him in my rearview mirror.
THE COURT: Do you recall what type of car he may have been driving?
JUROR SIX: It was a maroon Lincoln. I could see the Lincoln symbol, an older model.
The juror then informed the court that she lived in the Village of Horseheads, Chemung County, and explained that the Lincoln was about "six or eight car lengths behind [her]." The inquiry continued:
THE COURT: Can you give us with any percentage degree how certain you think that it may have been [defendant]?
JUROR SIX: 95 percent.
THE COURT: Okay. Is there a reason why you are bringing this up to us now, rather than let's say when we reconvened on Wednesday morning?
JUROR SIX: Because other juror members were scared for their own safety, because of certain people that were sitting watching the trial through the week.
THE COURT: Okay. And without getting into what other — those concerns may be, does this affect your ability to remain on the jury?
JUROR SIX: No.
THE COURT: Could you be a fair and impartial juror?
JUROR SIX: I can be a fair and impartial juror, yes. I say that, because the other juror members encouraged me, because their safety may be at risk.
THE COURT: Well, you did exactly what you were supposed to do by telling us your concerns. So without confirming whether that was or was not [defendant], and obviously, we don't know that, and we're just listening to you, you could put aside whatever that is?
JUROR SIX: Yes.
THE COURT: And determine this case solely on the evidence and the legal instructions that I gave you?
JUROR SIX: Yes.
In further questioning by the [*7]court and prosecutor, juror No. 6 explained that as she was going into her home, the Lincoln "was maybe three houses down from where [she] live[s]." As she was driving away from the courthouse, she observed defendant walking but did not see him enter a car. The inquiry concluded and jury deliberations resumed.
After conferring with his client, defense counsel requested a mistrial, contending that juror No. 6 could no longer be fair and impartial. Defense counsel raised concerns as to the timing of the disclosure and pointed out that other jurors felt threatened by the presence of defendant's family in the courtroom, raising a concern of implicit racial bias. In this regard, County Court agreed with defense counsel's observation that the spectators in the courtroom had done nothing inappropriate.
County Court denied the mistrial motion but then agreed to inquire of each individual juror of any safety concerns. The majority of jurors had no such concerns but a few comments are noteworthy. The following exchange took place with juror No. 3:
THE COURT: Do you have any concerns for your safety or your well-being as remaining as a member of the jury throughout the course of this trial?
JUROR THREE: Well, I didn't until she said she thought she might have been followed home.
THE COURT: Okay. We have already determined that that's probably unlikely to have been true.
JUROR THREE: Yeah.
THE COURT: And that juror has indicated that that — she can remain fair and impartial . . . 
JUROR THREE: But, you know, with it being drugs, there's always a drug ring, there's always somebody looking out for the other guy, type of deal.
Juror No. 3 had disclosed during voir dire that the confidential informant (hereinafter the CI), who had died prior to trial, was a distant cousin of her husband but that she did not know him. At this point in the inquiry, the court responded that the passing of the CI was unrelated to defendant. The juror then assured the court that she was not concerned for her own safety. When asked if she could "remain a fair and impartial juror," the juror replied, "I believe so. To my best ability."
Juror No. 2 raised a similar concern as to the CI, explaining that she became uncomfortable once she learned he had passed away. When asked about safety concerns, juror No. 7 responded, "[n]ot until today," explaining, "[t]hey were just all talking you know, and then it kind of strikes you that you're dealing with drug dealers . . . ." Juror No. 10 acknowledged that he "walked a little briskly to [his] car last night," referring to "drug circles, you know, other people . . . looking out for someone else's interests." Juror No. 11 told the court that she felt uncomfortable with one of the spectators, who she "felt . . . was staring at [her] a lot, and when [she] left last night, [she] felt like [the spectator] just watched [her] go right down." Despite these comments, jurors Nos. 2, 7, 10 and 11 all assured the court that they could [*8]be fair and impartial.
For starters, the very idea that a defendant followed a juror home raises startling safety concerns. It is evident from the above recitation that juror No. 6 discussed the Monday incident with the other jurors during deliberations before informing County Court. By her account, other jurors expressed their own safety concerns with her. The court observed that the Monday incident probably did not happen, but juror No. 6 clearly thought otherwise, expressing a 95% degree of certainty. In response, the court inquired as to the reason for the late disclosure, only to learn that other jurors had safety concerns. Disregarding that factor, the court further concluded that juror No. 6 could be fair and impartial, ignoring her explanation that she could be fair "because the other juror members encouraged [her], because their safety may be at risk." That extraordinary qualifier necessitated further inquiry by the court, but there was none.
Compounding the problem, County Court made no specific inquiry of the other jurors as to what juror No. 6 said to them about the Monday incident, instead asking only a generic question as to whether there were any safety concerns. When juror No. 3 expressed a safety concern, the court's response missed the mark. The operative point here is not what the court thought about the Monday incident, but whether and to what extent that experience affected juror No. 6's state of mind in her deliberations, not to mention the impact on the other jurors. To assure juror No. 3 that juror No. 6 confirmed that she could be fair completely ignores juror No. 6's qualified response keyed into the safety of her fellow jurors (see generally People v Ward, 129 AD3d 492, 493-494 [1st Dept 2015], lv denied 26 NY3d 936 [2015]).
As the Court of Appeals has explained, a juror is grossly unqualified under CPL 270.35 (1), "only when it becomes obvious that a particular juror possesses a state of mind which would prevent the rendering of an impartial verdict" (People v Buford, 69 NY2d at 298 [internal quotation marks and citation omitted]). As set forth above, it is our view that County Court failed to engage in the necessary probing and tactful inquiry that must take due account of the juror responses (see People v Rivera, 206 AD3d 1356, 1361-1365 [3d Dept 2022, Aarons, J., dissenting]). This record leaves the issue of juror safety unresolved, raising serious concerns about whether juror No. 6 and even juror No. 3 possessed the required impartial state of mind essential to an impartial jury. From our perspective, at the very least, juror No. 6 was "grossly unqualified" to continue serving as a juror. While we agree with the majority that the proof was sufficient to sustain the verdict, " 'the right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right' " (People v Neulander, 34 NY3d 110, 115 [2019] [brackets omitted], quoting People v Crimmins, 36 NY2d 230, [*9]238 [1975]). " 'The constitutional right of a criminal defendant to a fair trial includes the right to an impartial jury' " (People v Spencer, 29 NY3d 302, 309 [2017] [ellipsis omitted], quoting People v Rodriguez, 71 NY2d 214, 218 [1988]; see People v Kuzdzal, 31 NY3d 478, 483 [2018]). As such, the verdict should be reversed and the matter remitted to County Court for a new trial (see CPL §§ 270.35 [1]; 280.10).
Aarons, J., concurs.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: The CI did not testify because he died prior to trial.