# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 41
The People &c.,
    Respondent,
        v.
Jonathan Batticks,
        Appellant.

Jonathan R. McCoy, for appellant.
Rebecca Hausner, for respondent.

DiFIORE, Chief Judge:

This appeal by defendant presents the issue we found unpreserved on the appeal of his codefendant (*People v Bailey,* 32 NY3d 70, 82 [2018])—namely, whether the trial court abused its discretion as a matter of law in giving the jury a curative instruction and forgoing a *Buford* inquiry (*People v Buford,* 69 NY2d 290 [1987]) of a sworn juror after her mid-trial exclamation that she was "very offen[ded]" by the repetitive use of a racial slur by Bailey's counsel while cross-examining the victim. Viewed in context, the record supports

- 1 -

the trial court's findings that the juror's reaction was triggered by counsel's fifth and gratuitous use of the epithet, and provided no basis to indicate she was grossly unqualified. Since the entire incident unfolded in open court, a *Buford* inquiry of the juror was unnecessary, as the court was able to adequately assess that her outburst was not a transformative one and her sworn oath to be impartial remained intact. The court's remedy of admonishing the juror and counsel and issuing a carefully crafted curative instruction—which included a mechanism for any juror to advise the court if they could not be fair and impartial due to anything that occurred at trial—was not an abuse of its discretion.  Thus, the Appellate Division order should be affirmed.

I.

Defendant Batticks and codefendants Wiggins and Bailey were tried jointly for their assault of Stephen Davis while the four men were incarcerated.  Davis testified that a verbal dispute with Wiggins preceded the assault. Attempting to "goad" Davis during cross-examination (*Bailey*, 32 NY3d at 73), Bailey's counsel used Wiggins' various verbal taunts verbatim, including asking Davis four times whether Wiggins had called him an "old [n-word]."[1]  Davis, who recalled the younger Wiggins had called him an "old guy," also admitted Wiggins' may have used the slur, but said he viewed the slur as "just words."

---

[1] Batticks' counsel, who was the first of the three defense counsel to conduct cross-examination of Davis, did not inquire about Wiggins' use of the n-word on cross- or recross-examination of the witness.

After changing topics, Bailey's counsel revisited Wiggins' verbal provocations, and—for the fifth time—asked Davis whether Wiggins called him "an old [n-word]." Immediately, Juror Six stood and said: "Please, I am not going to sit here . . . and [have] you say that again. Don't say it again or I'm leaving. . . . I find that very offensive." The court immediately reprimanded the juror for her "inappropriate" outburst and admonished counsel for repeating the question "a half dozen times," directing him to "[m]ove on" and stop "ask[ing] the same question over and over and over again." Bailey's counsel moved for a mistrial, claiming Juror Six was grossly unqualified because she was unable to separate the facts from her own "distaste" for the racial slur. The court found the "juror's reaction" was directed solely at "the number of times" the slur was used, not the legitimacy of the questioning. Batticks' counsel moved to strike the juror on the grounds asserted by Bailey.

Finding that Juror Six was not grossly unqualified, the court denied the defense motions and opted instead to issue the jurors a curative instruction—directing them that it was inappropriate to speak from the jury box, they may not form any opinion of guilt or nonguilt until the case is submitted to them, they were not to hold it against any party if they disliked or disapproved of questions or objections and, if any jurors felt they could not be fair and impartial due to something occurring during the trial, to inform a court officer, who would alert the court. The court advised counsel that Juror Six would be discharged if she told an officer she could not be fair and impartial. When Bailey's counsel stated that the racial epithet might "come up" in summation, the court cautioned him not

to mention the word "fifteen times," adding it could "understand someone being offended by [the slur's] repeated use," since Davis acknowledged Wiggins may have used the word. The court reiterated that, "on its face," Juror Six's conduct did not indicate "she could not be [fair and impartial], only that she found the repeated use of the phrase distasteful" and refused Batticks' request to "specifically ask" Juror Six whether she could "be fair and impartial." The court issued the promised curative instruction to the jury, adding that it would "assume that all of you still believe that you can be fair and impartial."

All three defendants were convicted, upon the jury verdicts of second-degree assault. The jury acquitted them of the two top counts and deadlocked on the remaining counts. The Appellate Division affirmed the judgment against Batticks, finding "the trial court properly determined, based on its own observations, that no [*Buford*] inquiry was necessary" (165 AD3d 591 [1st Dept 2018]). A Judge of this Court granted defendant leave to appeal (32 NY3d 1202 [2019]), and we now affirm.

## II.

A defendant has a constitutional right to a trial by an impartial jury (*People v Kuzdzal*, 31 NY3d 478, 483 [2018]; NY Const, art I §§ 2, 6; US Const 6th, 14th Amends), one chosen according to law and in whose selection the parties have participated (*Buford*, 69 NY2d at 297-298). To protect this constitutional right, the legislature has enacted several procedural safeguards in CPL article 270 (*Buford*, 69 NY2d at 298). After the jury is sworn, but before the rendition of the verdict, the court's authority to discharge an incompetent juror is set forth in CPL 270.35 and is narrowly circumscribed. In *Buford*, we

set forth a framework for trial courts to determine, pursuant to CPL 270.35 (1), whether a sworn juror must be discharged as grossly unqualified to serve due to facts unknown at the time of selection or where the juror has engaged in misconduct of a substantial nature. Given the gravity of a juror's oath, the court's removal of a sworn juror "places a greater burden upon the moving party" than if a prospective juror "was challenged for cause," and "is satisfied only when it becomes obvious that a particular juror possesses a state of mind which would prevent the rendering of an impartial verdict" (*Buford*, 69 NY2d at 298 [internal quotation marks and citations omitted]). As this Court has long recognized, "[t]he law prescribes the qualifications of jurors. The court cannot add to, or detract from them. It cannot itself select the jury, directly or indirectly. It cannot in its discretion, or capriciously, set aside jurors as incompetent, whom the law declares are competent . . . " (*Hildreth v Troy*, 101 NY 234, 239 [1886]).

A sworn juror is not grossly unqualified and subject to removal "merely because [the juror] is irritated with one of the attorneys or disagrees with the way the evidence is presented" (*Buford*, 69 NY2d at 299). Further, "a juror's declaration of being emotional about the case" is not equivalent to "a declaration of actual bias" or state of mind preventing the juror from deciding the case solely on the evidence, "as a declaration regarding emotions alone does not render a juror grossly unqualified" (*People v Spencer*, 29 NY3d 302, 311 [2017]).

We review a trial court's response to allegations of juror impartiality "for abuse of discretion because the trial judge, having the ability to continually observe the jury in court, is in the best position" to assess juror demeanor and bias and "to devise an appropriate

remedy" (*Kuzdzal*, 31 NY3d at 485). This unique vantage point demands that courts be afforded wide latitude in investigating allegations of juror bias and in making the "delicate" determination as to whether a juror has become grossly unqualified (*id.*). Under this flexible approach, not every allegation of juror misconduct warrants an intrusive *Buford* inquiry, and we have approved alternate procedures and ameliorative instructions when juror bias or partiality is not in doubt (*id.* at 485-486). In determining whether there are new facts to impugn the jury's original oath of impartiality or a need to investigate alleged juror misconduct, "'the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source'" (*id.* at 485, quoting *United States v Angulo*, 4 F3d 843, 847 [9th Cir 1993]). Thus, while a court "must investigate and, if necessary, correct a problem, it must also avoid tainting a jury unnecessarily. . . . In this endeavor, sometimes less is more" (*id.* at 486, quoting *United States v Cox*, 324 F3d 77, 88 [2d Cir 2003]).

In *People v Mejias*, we approved of the court's issuance of a curative jury instruction without a *Buford* inquiry, where a juror's note suggested premature jury deliberations, as it did not indicate "the juror's impartiality was in doubt or that the juror had committed any misconduct" (21 NY3d 73, 79 [2013]). We again deferred to the trial court's broad discretion in investigating factual issues of juror bias in *Kuzdzal,* approving of the court's preliminary step of eliciting the spectator's sworn testimony as to an allegation of juror misconduct—resulting in the court's threshold finding that the allegation was not credible—which allowed it to rule out the need for a *Buford* inquiry. Indeed, a *Buford* inquiry may not always be the best course of action in response to an alleged prejudicial

occurrence, and the court may fashion an alternative remedy that simultaneously protects defendants' right to an impartial jury while "ensur[ing] that the jury proceedings [are] not 'jeopardized by unauthorized invasions'" (*Kuzdzal*, 31 NY3d at 486, quoting *Remmer v United States*, 347 US 227, 229 [1954]).  As we have reasoned, "[u]nnecessarily confronting sworn jurors with unfounded, irrelevant, or incredible allegations of misconduct may impact the impartiality of the jury, and mandating such an intrusive procedure regardless of the particular circumstances of a case may only encourage untoward tactics intended to disrupt the proceedings" (*id.*).

To be sure, our state courts often resolve incidents of juror annoyance with counsel without a *Buford* inquiry, as an outward expression of irritation does not, without more, indicate impartiality (*see e.g. People v Major*, 143 AD3d 1155 [3d Dept 2016], *lv denied* 28 NY3d 1147 [2017]; *People v Benet,* 45 AD3d 1449 [4th Dept 2007], *lv denied* 10 NY3d 761 [2008]).  Likewise, the Second Circuit ruled in *United States v Panebianco* (543 F2d 447, 457 [2d Cir 1976]) that no voir dire was required after two jurors expressed "annoyance" with counsel's questions, instructing that they "were only exhibiting impatience" with defense counsel's questioning

> "that had been admittedly 'a little facetious' and repetitious at times. *That jurors react naturally does not mean they are biased*.  By reiterating his cautionary instruction to the jury, [the court] did all that was necessary. Under the circumstances, this was probably a wiser course than a voir dire and was clearly not an abuse of discretion" (emphasis added).

## III.

Applying the foregoing principles, the trial court's measured response here was not

an abuse of discretion. The court's findings, which are entitled to deference as the court had the advantage of personally observing Juror Six's demeanor and body language (*People v Johnson*, 92 NY2d 976, 978 [1998]), are fully supported by the record. Based on its own observations of counsel and Juror Six's conduct in open court, the court found that the juror's "understand[able]" reaction was triggered by counsel's repetitive use "over and over again" of an offensive racial epithet that was gratuitous, as the witness already "acknowledged" Wiggins may have used the word. There was no indication that the juror's ability to maintain her sworn oath to render an impartial verdict was hampered by exposure to any facts outside the four corners of the evidence. Thus, no probing *Buford* inquiry was needed to "evaluate the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case" (69 NY2d at 299), as all pertinent facts were already before the court, providing a sound basis for its conclusion that her outburst was due to a natural frustration wholly unrelated to her state of mind in evaluating the evidence.

In fact, Juror Six revealed to all in earshot that she felt "very offen[ded]" by counsel's repetitious use of an extremely pejorative phrase. Her conduct in voicing her personal distaste for that disturbing trial strategy—while a breach of courtroom decorum— did not render her grossly unqualified or equate with a state of mind that prevented her from rendering an impartial verdict. "[E]ach juror inevitably brings to the jury room a lifetime of experience that will necessarily inform her assessment of the witnesses and the evidence. Emotions are natural human responses and the law does not expect jurors to be devoid of such feelings"—so long as they "have the capacity and the will to decide the case

based solely on the facts as they find them and applicable law as instructed by the court" (*Spencer*, 29 NY3d at 311-312 [internal citations and quotations omitted]). Juror Six's momentary expression of exasperation after the fifth iteration of the offensive word neither presented any conflict with those basic tenets nor indicated any alteration of her state of mind from the point when she took her solemn oath.[2]

The court's curative instructive was a thorough and sensible approach that addressed each of the concerns raised by counsel and appreciated the outburst for what it was—not an act of substantial misconduct, but a spontaneous outcry prompted by the repetitive use of a racial slur. The court immediately admonished Juror Six for her brief disruptive conduct and reset the orderly nature of the proceedings. The court's instruction that jurors should report to the court if they could not remain fair and impartial accomplished—by a less confrontational and broader stroke—the same result that would have been afforded by a *Buford* inquiry of the single juror, and sworn jurors are presumed to have followed those clear directives (*People v Davis,* 58 NY2d 1102 [1983]).[3]

---

[2] Notably, Juror Six's boldness in vocalizing her disdain for Bailey's counsel's repetition of the slur in a manner the trial court found was unnecessary to "establish[ ] a fact" or set "the scene" had no real application to the case against Batticks, whose defense was that he was in his cell during the assaults. Nor can one ignore the largely favorable jury verdict for all three defendants—including for Bailey, whose counsel triggered the juror's outburst.

[3] Batticks' belated claim that the curative instruction was "deficient" is unpreserved. So too are Batticks' arguments that Juror Six's outburst was "criminally sanctionable" and indicated she did not feel "bound by the court's authority" because of her threat to leave. Batticks' trial objection, which did not include a motion for a mistrial, focused on a possible lingering bias from the juror's personal offense at Bailey's counsel's repetitive use of a racial slur, failing to preserve for this Court's review any claim that the juror usurped the role of the court or counsel. Fundamentally, these claims ignore the circumstances of the

In sum, the record supports the court's conclusion that Juror Six's verbalized reaction reflected "understand[able]" exasperation with counsel's tactics and nothing more. The court's swift admonishments advising the juror and counsel to regain appropriate courtroom decorum and its measured "less is more" remedy (*Kuzdzal*, 31 NY3d at 486) in the form of a curative instruction instead of a more particularized inquiry of Juror Six was not an abuse of discretion on this record.

Accordingly, the order of the Appellate Division should be affirmed.

---

outburst and unpersuasively attempt to distance this case from *Buford*'*s* simple tenet that an expression of annoyance with counsel's performance, which is all that we have here, does not render a juror grossly unqualified, equate with bias or provide grounds for an inquiry of the juror's state of mind.

WILSON, J. (dissenting):

> "'I'm no idealist to believe firmly in the integrity of our courts and in the jury system—that is no ideal to me, it is a living, working reality. Gentlemen, a court is no better than each man of you sitting before me on this jury. A court is only as sound as its jury, and a jury is only as sound as the men who make it up.'"

(Harper Lee, To Kill a Mockingbird 205 [1982]).

In the more mundane trial underlying this appeal, we have the following *dramatis personae*:

Stephen Davis, the complainant: 42-year-old pretrial detainee held on a charge of assault for punching a taxicab driver in the face; previously convicted of "about" seven felonies and four misdemeanors resulting in 17 years of incarceration.

Princesam Bailey, a co-defendant: 26-year old in jail for a failed drug test while on parole; previously convicted of two drug-possession and one weapons-possession felonies.

Reginald Wiggins, a co-defendant: 19-year-old pretrial detainee held on a charge of assault; no prior convictions.

Jonathan Batticks, a co-defendant:  28-year-old pretrial detainee held on a charge of drug possession; two prior felonies, for drug and weapons possession.
(Scene: the Manhattan Detention Complex, formerly known as "the Tombs," a pre-trial detention facility for persons detained while awaiting trial.)

In the midst of cross-examination by defense counsel, who were well on the way to impugning the credibility of the principal witness for the prosecution, a juror ordered counsel to stop the way in which he was cross-examining, informing the court, parties, witness and fellow jurors that she would leave unless counsel stopped.  The court ordered counsel to stop.  Counsel asked either for a mistrial or, in the alternative, to replace the juror with an alternate or, in the alternative, to inquire privately of the juror whether she could remain unbiased and true to her oath, despite her outburst.  The prosecutor stated that she did not object to the replacement of the juror with an alternate.  Nevertheless, the court

ordered no mistrial, did not seat an alternate, and refused to make any inquiry of the juror, instead telling the entire jury panel that if any of them felt they could not be impartial, they should let a court officer know.  None did.

The majority is untroubled by the juror's disruption of the trial and usurpation of the role of the lawyers and court.  If, during oral argument of this appeal, I had told either counsel that I would leave unless counsel ceased a line of argument, counsel would be entitled to my recusal.  The Commission on Judicial Conduct might also have something to say about my behavior.  A juror's oath is no less serious than mine.  However, were I to make good on my threat, my colleagues would ably and fairly decide the case without me; a juror's threatened departure runs a risk of mistrial or a successful appeal overturning the verdict.

Directing appellate counsel to stop an argument or suffer my departure never crossed my mind, but I did ask counsel for the People during oral argument – twice – whether, had she been trying Mr. Batticks's case and a juror made the same outburst during her cross-examination of a defense witness, she would, at a minimum, want the court to inquire as to the impartiality of that juror.  Counsel twice did not answer my question.  What seems obvious to me is that this juror's extraordinary outburst required an inquiry into her impartiality and ability to abide by the juror's oath; any lawyer, prosecutor or defense attorney should want that inquiry.

Two fundamental errors underly the majority's affirmance of the proceedings below.  First, the majority has conflated the basis for inquiring <u>whether</u> a juror may be unfit to continue to serve with the determination of unfitness.  Second, the majority purports to

affirm what amounts to mind reading of the juror, certain that her outburst was "natural frustration wholly unrelated to her state of mind in evaluating the evidence." In these circumstances, the integrity of the right to trial by an impartial jury required the court to inquire of the juror or, given the agreement of the People and defense counsel, to replace the juror with an alternate.

I

The People's narrative, largely resting on Mr. Davis's testimony, was that Mr. Davis arrived early because he "wanted to be first" in line to exchange old sheets for new at the weekly linen exchange. While the line grew behind Mr. Davis, two unidentified inmates – not any of the defendants, attempted to cut the line at its very front, to which Mr. Davis and another inmate told the "younger kids . . . yo, get out of the way, you all know you have to go to the back." Then, from somewhere further back in line, an inmate, who turned out to be Mr. Wiggins, "screamed" at Mr. Davis that he was "tired of you old cats". Mr. Davis said he "ignored it, but [Mr. Wiggins] kept talking," and when Mr. Davis eventually asked whether Mr. Wiggins was talking to him, and obtained verbal confirmation thereof, Mr. Davis responded, "all right." Then, when Mr. Wiggins used "a slang term for inviting [me] to . . . suck his privates . . . and went on to say that he would F me up, he would fuck me up," Mr. Davis responded that "there is not going to have a need for any of that," after which Mr. Davis "just stopped the conversation."

Then, according to Mr. Davis, while he was making his bed and tidying up, Mr. Wiggins came to the door of Mr. Davis's cell; Mr. Davis asked, "what's up," and Mr. Wiggins "began swinging on me." Mr. Wiggins did not strike Mr. Davis, but Mr. Davis

landed two punches to Mr. Wiggins's face, further testifying "I can fight." To spare the tedium of recounting more of Mr. Davis's testimony, let me summarize it as portraying Mr. Davis as a now reformed, mild-mannered, honest, rule-abiding person, eventually beaten by Mr. Wiggins and his two accomplices, Messrs. Bailey and Batticks, while doing his utmost to avoid any altercation.

In opening argument, Mr. Batticks's counsel made clear that a principal defense would be "that Mr. Davis the complainant in this case is not a credible, believable or reliable witness." On cross-examination, defense counsel proceeded on that strategy, designing numerous questions to show that Mr. Davis was not credible. Among other things, Mr. Davis claimed he was wrongly convicted for the gunpoint robbery and was just borrowing an item that formed the basis of his burglary conviction. He admitted he had fifty disciplinary infractions, which "of course" involved fighting with other inmates, five or ten of which were "assaults". Nevertheless, he continued to attempt to paint himself as someone who "would have apologized" for the linen-exchange incident "because I'm known to do that." Then, after counsel asked whether Mr. Wiggins yelling "suck my frank, something like that," made Mr. Davis a little mad, Mr. Davis responded, "No. I kind of grew out of that." Counsel asked whether Mr. Davis had grown out of fighting, to which he answered, "No, I grew out of applying that particular term and feeling to fight because of that particular term." That answer then provoked the following cross-examination, which is at the heart of this appeal:

Q.      But when he called you an old nigger –

A.      Old nigger? I don't believe he called me an old nigger.  But once again, they're words.

Q.      They're words.  So he is on the stairwell in front of everybody, about 46 other inmates,          calling          you          an          old          nigger?

THE COURT: The testimony is there are ten to fifteen people on the stairs. So I don't know where you got 46 from.
. . .
Q.      There are several inmates there that day?

A.      Yes.

Q.      So Mr. Wiggins is yelling these obscenities to you.  Right?

A.      Yes.          He          is          not          really          yelling          though.

Q.      He is not standing next to you?  He's talking?

A.       Maybe he was as close as you, maybe closer.  He's not yelling. He is just talking. . . .  He's talking. He's like, you know, you punks. He is talking. He is not screaming and yelling. He's just saying what he's saying.

[*But his testimony on direct was that Wiggins was "screaming" at him, so defense counsel is now making inroads into Davis's credibility.*]

Q.      And other people can hear him?

A .      Yes.  People can hear him.

Q.      And he is calling you an old nigger.  Right?

A.      I don't recall saying he -- him calling me an old nigger.  He called me an old something or other.

Q.      You gave a statement to Officer Santiago?

A.      I don't recall. If he said old nigger, if he said old dude or old guy, yes, he referred to me as an old person.

Q.      You told Officer Santiago that he called you an old nigger?

A.      Okay. He may have.

*[Davis retracts his denial that Wiggins called him an "old nigger" when confronted with what he told the officer at the time: this goes both to his credibility generally and to his portrayal of himself as a nonconfrontational victim.]*

Q.      And this is going on in front of other people.  Right?

A.      Yes, it is.

Q.      And that's kind of disrespectful to you?

A.      Very disrespectful.

Q.      Very disrespectful?

A.      Absolutely.

Q.      And he's a punk kid?

A.      Right.

*[Now counsel has established that Davis believes he was very disrespected by a punk kid, further calling into question Davis's recitation of the events.]*

Q.      You are not going to take that?

A.      I'm not going to say I'm not going to take that. He is a knotty-nosed kid and he doesn't -- it's no bother, might give him a pass.

Q.      You might give him a pass?

A.      Yes.  Like I said, initially that would have been an immediately situation, you know, you say something like that to a guy in jail, where we have this homophobia thing, you say invite some guy to your privates, that's like me asking for fighting. But like I said

Q.      You are better than that? You are changing your life?

A.      I am working on it.  It's a work in progress.

Q.      It's a work in progress?

A.      Yes.

Q.      Interesting.  So he is saying these things to you, he's disrespected you in front of these people, and you are just blowing it off?

A.      Yes.

. . .

Q.      And you have Mr. Wiggins saying, suck my franks and

THE WITNESS: Well, he said I'm going to start throwing franks at you.

[*Counsel's cross examination about Wiggins calling Davis an "old nigger" was diverted by Davis focusing, instead on the "throwing franks" insult.  Counsel then tries to redirect the cross-examination to the "old nigger" insult, which is what he'd been asking about before Davis took the cross-examination in a different direction.*]

Q.      I apologize. And he's calling you an old nigger?

A JUROR: Please, I am not going to sit here --

THE COURT: Ma'am.

A JUROR: -- and having you say that again.  Don't say it again or I am leaving.

THE COURT: Ma'am, ma'am.

A JUROR: I find that very offensive.

THE COURT: Ma'am, that's not appropriate from you.  But, Mr. Hardy, we've been here a half dozen times.

MR. HARDY: Judge --

THE COURT: I don't want to hear it again.  Okay.  You don't ask the same question over and over and over again.  Move on.

The majority's conclusion that counsel's last use of the phrase "old nigger" was "gratuitous" is pure speculation.[1]     Indeed, that speculation is contrary to the record. Counsel's first four uses of the words were required to get Mr. Davis to admit that Wiggins actually called him that.  One fair inference from Mr. Davis's repeated denials and ultimate admission (when confronted with his prior statement to the police) is that he was untruthfully painting himself as having undergone a transformation to a prison pacifist. There is no basis on which to conclude counsel's next (and final) usage was gratuitous – it was the first time he would have been able to pose a question to Davis based on Davis's recalcitrant admission, in a cross-examination that may well have been working to discredit Mr. Davis (and, according to the majority, may have worked to some degree even though curtailed by the rogue juror, because the jury acquitted the defendants of the two top counts).  The propriety of the court's instruction to counsel to move on is not the question here.  Instead, the question is whether the juror's outburst and statement that she would quit if counsel continued provides a basis to question – not decide – her ability to serve impartially.

II

---

[1] Equally odd is the majority's citation to our decision in Mr. Bailey's case for a factual finding by this Court that counsel's purpose was to "'goad' Davis during cross-examination" (majority op at 2).  As we have said in countless decisions denying ineffective assistance of counsel claims on direct appeal, we cannot surmise as to what counsel's motives were in pursuing or failing to pursue an argument (*see e.g. People v. Maffei*, 35 NY3d 264, 269–270 [2020]). Perhaps counsel was trying to goad Davis, perhaps to have him stake out a position of passive nonviolence that the jury would find incredible, or perhaps simply to catch him in a contradiction between his direct testimony and his report to the police – or perhaps all of the above.

We have emphasized the "fundamental" role of the jury in our criminal justice system (*People v Kuzdzal,* 31 NY3d 478, 483 [2018]; *People v Branch*, 46 NY2d 645, 652 [1979] ["Nothing is more basic to the criminal process than the right of an accused to a trial by an impartial jury"]). In *People v Buford*, we emphasized the paramount right of criminal defendants, guaranteed by the Federal and New York Constitutions, to trial by an unbiased jury composed of persons qualified to serve (69 NY2d 290, 297–298 [1987]). Jurors take an oath, and receive instructions, admonishing them on their role to listen carefully, evaluate fairly, discuss openly once the case is turned over to them, and return a verdict. They plainly are not to express their views of trial proceedings while trial is conducted, interrupt the proceedings, or threaten to walk out if the trial does not proceed as they like. "To protect this constitutional right in criminal cases, the Legislature has enacted several procedural safeguards (*see* CPL art 270)" (*id.* at 298). The *Buford* inquiry is a vital tool to protect the right of criminal defendants to a fair trial by an unbiased jury.[2]

As set out in our recent decision in *Kuzdzal*, courts should engage in a two-step framework for determining whether a seated juror should be removed as "grossly unqualified to serve" or having engaged in "substantial misconduct" (CPL 270.35 [1]). The first step asks whether there is "credible information" suggesting that a juror may be unqualified or engaged in misconduct (*Kuzdzal*, 31 NY3d at 486). If such credible

---

[2] *Buford* involved the People's request to remove a seated juror over the defendant's objection. Whether the majority's observation that "the removal of a sworn juror 'places a greater burden upon the moving party' than if a prospective juror 'was challenged for cause'" (majority op at 5) applies to a defendant's request to remove a seated juror where there is no objection from the People was not briefed or argued by the parties here, and therefore is not before us.

information exists, the second step is mandatory: "Trial courts, when presented with some credible information indicating that a sworn juror may be grossly unqualified, must conduct a "probing and tactful inquiry" of the juror" (*id.*).

In many cases in which a sitting juror's conduct is called into question, including several of the examples cited by the majority, the purported transgression does not occur in the plain view of the trial judge.[3] The first step – the existence of credible information – reflects the reality that the purported juror transgression is often reported second hand and/or cryptically, sometimes by someone with a connection to a party, or sometimes by a juror who may be upset at how another juror has acted, or sometimes in a jury note that facially suggests no impropriety.[4] The determination of whether the information is "credible" is an examination of the source of the information. For example, in *Kuzdzal*, a woman who was the defendant's lifelong friend claimed to have overheard one juror telling another juror that the defendant was a scumbag (*id.* at 481–482). The court ordered an inquiry of the friend; her testimony was inconsistent with objective facts, and she admitted to having been removed from the courtroom by a court officer on a prior day (*id.*). On

---

[3] Similarly, facial gestures, body language or sighs or other audible but nonverbal sounds made by jurors are at best equivocal and would not, without more, provide credible evidence suggesting bias. Here, the juror's outburst was verbal, definitive and unfiltered. Whether, as the majority states, ordinary "incidents of jury annoyance" do not require a *Buford* inquiry (*United States v. Panebianco*, 543 F2d 447 [2d Cir 1976]), is not germane to the extraordinary outburst involved here. In any event, *Panebianco* was decided well before *Buford*, and *Buford* was based on state law, not federal.

[4] *See People v. Matiash*, 197 AD2d 794 (3d Dept 1993); *People v. Terrell*, 149 AD3d 1108, 1109 (2d Dept 2017); *People v. Cecunjanin*, 67 AD3d 1072, 1077 (3d Dept 2009); *People v Joaquin*, 138 AD3d 422 (1st Dept 2016); *People v White*, 73 AD3d 820, 821 (2d Dept 2010).

remand from our court, the Appellate Division held that the weight of the evidence supported the conclusion that the friend was not credible; hence, no *Buford* inquiry was required (163 AD3d 1439, 1440–1441 [4th Dept 2018]). In *Mejias*, a juror sent a note to the court after the close of evidence, and after – by agreement of the parties – the jury began reviewing the trial exhibits (21 NY3d 73, 77 [2013]). We held that the note's use of the word "we" provided no indication that the juror's "impartiality was in doubt or that the juror had committed any misconduct," and therefore "the rationale of *Buford* is not implicated in the circumstances of this case" (*id.* at 76, 79).

Here, there is no threshold question of the credibility of an allegation that the juror is grossly unqualified or has engaged in misconduct. The juror's outburst occurred in open court, where the judge could observe her behavior directly: he was not required to parse the language of a jury note or assess whether a third-party truthfully recounted an overheard conversation. Indeed, the judge's immediate reaction was to tell the juror: "Ma'am, that's not appropriate from you."

The majority's reasoning – that the juror was merely reacting to a word she found offensive and her reaction did not render her unfit – goes to the second step, not the first, unless the majority is claiming that the juror's outburst and threat to walk out contains not even a suggestion of bias or misconduct. The majority's view surely has nothing to do with credibility. Instead, the majority assumes – based on nothing more than surmise – that the juror's wrath did not tarnish her view of the case. But that analysis collapses the two distinct inquiries into one, asking only whether the juror should be removed – not whether she should be examined. This juror's conduct is so patently anathema to the role

of jurors that some inquiry must be made of her, tactfully and privately, as our caselaw demands, to "discharge our 'overriding responsibility' to ensure the public's confidence in the fairness of trials" (*People v Neulander*, 34 NY3d 110, 115 [2019], quoting *People v Crimmins*, 36 NY2d 238, 238 [1975]).

The majority highlights *Buford*'s observation that a juror is not grossly unqualified "merely because she is irritated with one of the attorneys or disagrees with the way the evidence is *presented*" (*Buford*, 59 NY2d at 299). But that bears on whether a juror should be *discharged*, not whether a *Buford* inquiry must be performed. The question is only whether "some credible information" suggests that a juror may no longer be fit to serve because of bias or misconduct (*Kuzdzal*, 31 NY3d at 486). Here, as Mr. Batticks argued, the misconduct indisputably provided some credible evidence of the juror's unfitness to serve.

As the majority notes, the reason the inquiry must be done tactfully and privately is to avoid intruding unnecessarily on the jury's function. However, once step one is satisfied, as I believe it is here, step two is mandatory.[5] Although the court conducted no inquiry of the juror, the majority unquestioningly accepts its conclusion that the juror merely demonstrated "natural frustration wholly unrelated to her state of mind." That conclusion rests on two wholly unsupported assumptions: first, that the juror's reaction reflected

---

[5] Because the second step is mandatory if credible evidence suggesting juror bias, impropriety or misconduct exists, the majority's discussion of the court's generic instruction is not germane to this appeal (see majority op at 9). Had the proper inquiry of the juror been made, that instruction might have proved to be all that was required, insufficient, or wholly unnecessary, but the generic instruction cannot supplant the inquiry if the first step is met.

nothing more than "natural frustration," and second, that her frustration was unrelated to her state of mind (by which the majority presumably means unrelated to her ability to serve in an unbiased manner – even the majority must acknowledge that the cross-examination affected the juror's state of mind).  The juror's reaction, however, is plainly <u>un</u>natural – try as I might, I can find no other case in any jurisdiction in which a juror interrupted a cross-examination and threatened to walk out unless counsel stopped.  The degree of her euphemistically-labelled "frustration" ("wrath," came to my mind) is leagues out of bounds of conduct expected from jurors.[6]  Whether the juror's gross agitation persisted and might

---

[6] Perhaps the majority means that it is natural for any juror to be incensed by the use of the word "nigger" in any context.  If so, that view is problematic, for reasons far too fascinating and complex to address meaningfully in a footnote.  The following few observations will have to suffice: (1) the use of "nigger" and its variants (most commonly "nigga," which is likely what Mr. Wiggins said, though transcribed as "nigger") among African Americans is both prevalent and controversial within and without the community (*see*, *e.g.*, Sean Price, *Straight Talk About the N-Word*, Teaching Tolerance [Fall 2011], available at https://www.tolerance.org/magazine/fall-2011/straight-talk-about-the-nword [last accessed Sep. 25, 2020]; Dave Sheinin & Krissah Thompson, *Redefining the Word*, Wash. Post [Nov. 9, 2014], https://www.washingtonpost.com/sf/national/2014/11/09/the-n-word-an-entrenched-racial-slur-now-more-prevalent-than-ever/; Shawn Corey Carter (a/k/a/ Jay-Z), Jigga My Nigga [Ruff Ryders Ent. 1999]); (2) whereas all three defendants and Mr. Davis are African American, the juror's race is unclear, as is the race of counsel, which adds to the complexity in guessing at the cause and implications of the juror's outburst (*see, e.g.,* Randall L. Kennedy, *Who Can Say 'Nigger'? And Other Considerations*, J. of Blacks in Higher Educ., No. 26 at 86–96 [Winter 1999-2000]; John McWhorter, *The Idea That Whites Can't Refer to the N-Word*, Atlantic [Aug. 27, 2019], https://www.theatlantic.com/ideas/archive/2019/08/whites-refer-to-the-n-word/596872/.) and (3) Mr. Davis's recollection of "old" but not "nigger" when spoken by Mr. Wiggins tends to confirm that the word meant nothing between them, filling in as a substitute for "bro" or "homie" or, in whiter English, "fellow".

have affected her in deliberations is precisely the question that cannot be answered without an inquiry.[7]

Two additional points peculiar to the facts of this case warrant mention.  First, because the juror's outburst occurred in open court in front of all the other jurors, counsel, the witness, spectators and the judge, the usual concern about what the jury might think when one of its number is separated for questioning has little force.  In many cases, the information suggesting unfitness is unknown to some or all of the other jurors; individually questioning a juror may cause some surprise and anxiety on the part of the other jurors.  That is plainly not the case here, because all the other jurors witnessed the outburst.

Second, if the concern about interfering with the province of the jury were weighty in this case, the court had a ready solution, agreed to by all parties, that would have avoided any inquiry: simply replace the juror with an alternate.  Indeed, earlier in the trial a juror failed to show up.  The court contacted the juror, found that he had mistakenly gone to

---

[7] As the majority notes, one defense advanced by Mr. Batticks was that he was not present for either of the attacks on Mr. Davis.  Of course, undermining Mr. Davis's credibility would support that defense, so it is not clear why the majority thinks Mr. Batticks's claimed absence rendered him uninterested in attacking Mr. Davis's credibility.  More importantly, the prosecution's theory was that Mr. Batticks participated in the assault; his counsel surely had an interest in painting Mr. Davis as incredible. Similarly, the majority claims that the juror's explosion occurred during examination by Mr. Bailey's counsel, and therefore any juror bias or misconduct did not affect Mr. Batticks.  But Mr. Batticks and his co-defendants were charged with attempted gang assault, which requires the participation of three or more persons; as to at least that count, an acquittal of one would require an acquittal of all. In addition, their cross-examinations of witnesses were coordinated, and in summation they relied on each other's cross-examinations – hardly a surprise in a trial charging several defendants with a joint assault.  Mr. Batticks had as much to gain as did Mr. Bailey from the blocked cross-examination of Mr. Davis, and as much to lose from a potentially biased juror.

work thinking that the court was not in session that day, and instead of either ordering the juror to come to court or delaying the trial one day, the court *sua sponte* discharged the juror and seated an alternate.  If we are not worried about summarily replacing a juror merely confused about the court schedule, why should we retain, unexamined, a juror who orders counsel to stop questioning under the threat she will leave, when ready replacements are available and agreed to?

A *Buford* inquiry would have prevented any need for speculation. It would have clarified the juror's feelings towards the defendants, and either confirmed her ability to serve impartially or led to her discharge and replacement. Either way, Mr. Batticks would have been assured that his jury was fair and unbiased. Because the trial judge neither replaced the juror on consent nor inquired of the juror as to the reason for her outburst and her ability to judge the evidence fairly,  Mr. Batticks cannot be confident that he was convicted by a jury willing to decide the case solely on the evidence before it. His constitutional right to a fair trial was violated, and he is owed a new one.  We are all owed a system where outlandish behavior by jurors is not tolerated.

Order affirmed. Opinion by Chief Judge DiFiore.  Judges Stein, Garcia and Feinman concur.  Judge Wilson dissents in an opinion in which Judges Rivera and Fahey concur.

Decided October 20, 2020